EDWARD BIGLIOLI, GENERAL ADMINISTRATOR OF THE ESTATE OF ETHEL BIGLIOLI, DECEASED, PLAINTIFF-APPELLANT, v. DUROTEST CORPORATION, A CORPORATION OF NEW JERSEY, DEFENDANT-RESPONDENT.

EDWARD BIGLIOLI, ADMINISTRATOR *AD PROSEQUENDUM* OF ETHEL BIGLIOLI, DECEASED, PLAINTIFF-APPELLANT, v. DUROTEST CORPORATION, A CORPORATION OF NEW JERSEY, DEFENDANT-RESPONDENT.

Argued November 25, 1957—Decided February 3, 1958.

34

*Mr. Aaron Gordon* argued the cause for appellant.

*Mr. Robert Shaw* argued the cause for respondent (*Messrs. Shaw, Pindar, McElroy & Connell,* attorneys).

The opinion of the court was delivered by

HEHER, J. The gravamen of these actions in tort for negligence is the wrongful exposure of plaintiff's decedent, Ethel Biglioli, in the course of her employment with the defendant corporation, to "beryllium and its various compounds and combinations" used in the manufacture of fluorescent and incandescent electric light bulbs.

The first action was brought February 26, 1952 by Ethel Biglioli herself. The complaint alleged total permanent disability from the inhalation of toxic beryllium dust and fumes while in the pursuit of her work. Her death, August 13, 1952, in consequence of the injury thus pleaded, as is said, was followed by the substitution of her general administrator as the plaintiff in the action and the bringing of

plaintiff's suit as administrator *ad prosequendum* under the Death Act, *N. J. S.* 2*A* :31–1 *et seq.*

There was summary judgment for defendant in each action in the Hudson County Court; and the Appellate Division of the Superior Court affirmed. The case is here by our certification.

As stated by Judge Clapp in the Appellate Division, 44 *N. J. Super.* 93 (1957), the facts were orally stipulated by the attorneys "[f]or the purposes of the motion for summary judgment." Defendant had made use of beryllium in a manufacturing process "for some considerable time prior to January 1, 1950, but never on or after that date, and had exposed Miss Biglioli to the beryllium up until a certain day in October 1949, but not subsequently"; "[o]n that day she left work and never returned to it, except for two days in January and again on February 27, 1950, which was the last day of her employment"; she "became ill in 1947 toward the latter part of the year"; she "was treated by doctors for stomach trouble, for what they diagnosed as colds, but nobody told her that she had beryllium and beryllium did not develop in her and she did not know she had it until after she had stopped working on February 27, 1950"; the "beryllium poisoning of her lungs did not develop, was not manifest or diagnosed until 1951 in July when they had a test done at Trudeau Sanatarium in Saranac Lake"; "[t]hen and only then in July of 1951 was there a manifestation that she had this condition"; "[t]hen and only then can we assume—because if her doctors didn't know it, how could she have known it—did she know that she had any condition which could be attributed to her exposure in the plant."

The County Court held that defendant "used no beryllium in its factory at anytime during the year 1950," and the deceased employee "suffered no exposure to beryllium * * * subsequent to January 1, 1950"; and "after that date there was no wrongful act by the defendant causing injury to the plaintiff"; the "statute of limitations started to run from the last wrongful act * * *, that is, * * *

the exposure to beryllium," and the bar of the statute became effective two years thereafter, "regardless of when plaintiff discovered that her illness" was the consequence of the pleaded wrongful act.

The significance of January 1, 1950 is that beryllium poisoning was not, prior to that date, a "compensable occupational disease" under section 2 of the Workmen's Compensation Act, *R. S.* 34:15–7 *et seq.,* but was brought within its coverage by the amendment of sections 30 and 31 made by *L.* 1949, *c.* 29, *N. J. S. A.* 34:15–30; 34:15–31, effective on the given day.

In the Appellate Division, Judge Clapp ruled that "\* \* \* if a definite bodily impairment occurs after January 1, 1950 as a result of berylliosis, a right to compensation accrues under the statute at, or possibly subsequent to, the time of the impairment," to the exclusion of the common-law remedy for negligence; and that, on the contrary hypothesis, the statute of limitations, *N. J. S.* 2A:14–2, bars an action for negligence. This, on the assumption, citing *Tortorello v. Reinfeld,* 6 *N. J.* 58 (1950), among other cases, that the common-law cause of action "accrues \* \* \* on the conjunction of two events, the wrongful act and the injury," and here "the last wrongful act or acts occurred in October 1949 when she was last exposed to beryllium, and (under the assumption above made) the injury occurred prior to January 1, 1950," and if she suffered "a definite bodily impairment as a result of the beryllium" before then, the pleaded causes of action are barred by the statute of limitations; and if her own action for negligence was barred, no right of action for negligence vested on her death in her administrator *ad prosequendum* and the statutory beneficiaries under the Death Act, *N. J. S.* 2A:31–1; 2A:31–4, citing *Knabe v. Hudson Bus Transportation Co.,* 111 *N. J. L.* 333 (*E. & A.* 1933); *Turon v. J. & L. Construction Co.,* 8 *N. J.* 543 (1952).

The amended section 30 of the Compensation Act, *N. J. S. A.* 34:15–30, effective January 1, 1950, provides that when "employer and employee have accepted the pro-

visions of this article as aforesaid," compensation for personal injuries or death suffered by the employee "by any [work-connected] compensable disease" shall be made as therein directed, save when the injury or death is caused by "willful self-exposure to a known hazard with the intention of contracting an occupational disease." And the amended section 31, *N. J. S. A.* 34:15–31, defines the phrase "compensable occupational disease" to "include all diseases arising out of and in the course of employment, which are due to causes and conditions which are or were characteristic of or peculiar to a particular trade, occupation, process or employment, or which diseases are due to the exposure of any employee to a cause thereof arising out of and in the course of his employment." This all-embracive definition supplants the prior specific enumeration of compensable occupational diseases not inclusive of berylliosis.

The compensation for death or "disability total in character and permanent in quality" attributable to an occupational disease is the same in amount and duration as for "death or disability" caused by a compensable "accident"; also the mode of determining the "duration of temporary and permanent partial disability, either or both, and the duration of payment for the disability due to occupational diseases" shall be according to "the same rules and regulations" as are applicable to "accident or injury." *R. S.* 34:15–32.

Section 33, as amended by *L.* 1948, *c.* 468, *N. J. S. A.* 34:15–33, provides that no compensation shall be payable for death or disability by occupational disease unless the employer "during the continuance of the employment shall have actual knowledge that the employee has contracted a compensable occupational disease," or unless the employee, or someone on his behalf, or some of his dependents, or someone on their behalf, shall give to the employer written notice or claim that the employee has contracted such disease, such notice to be given "within a period of five months after the date when the employee shall have ceased to be subject to exposure" to the disease, "or within ninety days after the employee knew or ought to have known the nature of

his disability and its relation to his employment, whichever period is later in duration, * * *."

And section 34, as amended by L. 1948, c. 468, N. J. S. A. 34:15-34, bars all claims for compensation for occupational disease unless a petition is filed with the Bureau "within two years after the date on which the employee ceased to be exposed in the course" of the employment to such disease, "or within one year after the employee knew or ought to have known the nature of his disability and its relation to his employment, whichever period is later in duration." There is a time limitation also where there has been a default in the payments provided for in an agreement of compensation, and where "a part of the compensation" has been paid by the employer; and there is an overall provision that, at all events, claims for compensation for such disease shall be "forever barred" unless a petition is filed "within five years after the date on which the employee ceased to be exposed" in the course of the employment to the disease, provided that in the event of the death of an employee who has been paid compensation on account of such disease, a petition on behalf of the dependents shall be timely if filed within two years after the last payment to the employee, even though such two-year period, or a part thereof, extends beyond the given five-year period.

The contention is that the act of 1949 enlarging the occupational disease coverage of the Compensation Act, "effective January 1, 1950," is "not retroactive in language or in intent and if the Legislature had endeavored to make [such provisions] retroactive," the statute "would be invalid," as in contravention of *Article* IV, *section* VII, *paragraph* 3 of the 1947 *State Constitution,* forbidding the passage of "any bill of attainder, *ex post facto* law, or law impairing the obligation of contracts, or depriving a party of any remedy for enforcing a contract which existed when the contract was made," citing *J. W. Ferguson Co. v. Seaman,* 119 *N. J. L.* 575 (*E. & A.* 1938); *A. P. Smith Mfg. Co. v. Court of Common Pleas of Essex County,* 107 *N. J. L.* 38 (*Sup. Ct.* 1930); *Erie Railroad Co. v. Callaway,* 91 *N. J. L.*

32 (*Sup. Ct.* 1917); *Baur v. Court of Common Pleas,* 88 *N. J. L.* 128 (*Sup. Ct.* 1915).

It is said in argument that the word "were" in the amended section 31, *N. J. S. A.* 34:15–31, "is not indicative of the intent * * * to give the statute a retroactive effect to prior noncompensable occupational diseases," but "only applies to occupational diseases suffered from exposure * * * occurring on and after January 1, 1950, which were due to exposure during period from and after January 1, 1950 and before a claim petition is filed," and here "there is no remedy available" under the Compensation Act for the worker's death "because all of her exposure to beryllium occurred before January 1, 1950 and not after that date, * * * even though she worked for defendant on several days in 1950."

Compulsory compensation, in lieu of the employer's common-law responsibility for negligence or default of duty, is comprehended in the police power reserved to the States; the principle of compensation is grounded in reason and natural justice, said Mr. Justice Pitney in *New York Central R. Co. v. White,* 243 *U. S.* 188, 37 *S. Ct.* 247, 61 *L. Ed.* 667 (1917), and the provisions of the particular act constituting such exercise of sovereignty are to be assayed accordingly.

But ours is an elective or optional system, contractual in nature, the first of its kind in this country, deemed the preferable course as a matter of social policy or as a means of avoiding the constitutional challenge later overruled in *New York Central R. Co. v. White, supra.* By mere inaction, the parties to the contract of service impliedly stipulate for the payment of compensation under Article 2 of the act, headed "Elective Compensation," for the disabling consequences of an accident of the statutory class. *Miller v. National Chair Co.,* 127 *N. J. L.* 414 (*Sup. Ct.* 1941), affirmed 129 *N. J. L.* 98 (*E. & A.* 1942).

The Compensation Act enters by operation of law into every contract of hiring made within this State, unless there be an affirmative disavowal of the scheme for the alternative

common-law liability for negligence as modified by the provisions of Article 1 of the act. The "agreement" may be "either express or implied," *R. S.* 34:15–7; and unless there be, *R. S.* 34:15–9, "as a part of such contract an express statement in writing prior to any accident, either in the contract itself or by written notice from either party to the other," that the provisions of Article 2 "are not intended to apply, then it shall be presumed that the parties have accepted the provisions" of that article "and have agreed to be bound thereby." Thus, reality of consent is not an indispensable element, although it may exist in the individual case, for Article 2 is applicable even though the parties did not know of the existence of the statute or, knowing, did not in fact have it in view, in such circumstances an agreement "implied by the law," *quasi*-contractual in nature. And the compensation provided by Article 2 is exclusive of all else; there can be no other recovery or measure of compensation in cases ruled by its terms. *Miller v. National Chair Co., supra.* See also *Sexton v. Newark District Telegraph Co.,* 84 *N. J. L.* 85 (*Sup. Ct.* 1913), affirmed 86 *N. J. L.* 701 (*E. & A.* 1914); *J. W. Ferguson Co. v. Seaman, supra; Streng's Piece Dye Works, Inc. v. Galasso,* 118 *N. J. L.* 257 (*E. & A.* 1937). Article 2 of the act is designed to provide social insurance in the common and individual interest. *Young v. Sterling Leather Works,* 91 *N. J. L.* 289 (*E. & A.* 1917); *Imre v. Riegel Paper Corporation,* 24 *N. J.* 438 (1957).

Here, the employer and employee had indisputably accepted the provisions of Article 2 of the act, as amended by the 1949 statute cited *supra,* at the time when the employee's service was terminated by the disability then not known to be work-connected. And while the amended section 30, *L.* 1949, *c.* 29, *N. J. S. A.* 34:15–30, allows compensation for "personal injuries" or death, the amended section 33, *L.* 1948, *c.* 468, *N. J. S. A.* 34:15–33, speaks of compensation payable for "death or disability by occupational disease," in limiting the time for notice to the employer that the employee "has contracted a compensable occupational disease."

■ Disability, actual or presumed, measures the employer's obligation to render compensation. *Everhart v. Newark Cleaning & Dyeing Co.,* 119 *N. J. L.* 108 *(E. & A. 1937).* There, compensation was allowed for "disfigurement, in addition to the strictly functional loss ensuing from the scars," as within the provision for "disability" resulting from "personal injuries" bearing the statutory relation to the employment; the test under the cited provision of the act was held not to be "the immediate impairment of the earning power," but rather the "loss ensuing from personal injury which detracts from the 'former efficiency' of the workman's 'body or its members in the ordinary pursuits of life'"; the benefits given by the particular provision were deemed to be "in the nature of an indemnity for the personal injuries sustained, rather than for the mere loss of earning power."

This interpretive principle was applied in *Sutkowski v. Mutual Chemical Co. of America,* 115 *N. J. L.* 53 *(Sup. Ct.* 1935), where the workman suffered a perforation of the nasal septum from a service-connected use of chrome, a permanent condition not serious in its immediate consequences; there was no disablement, no interruption of service, and no loss of earnings; an award was made at the rate of five percent of total permanent disability for "a functional loss, permanent in quality," even though the worker's "capacity to render the service at which he was engaged was not thereby impaired, or his earning power diminished"; the provision of the act that compensation shall not accrue until there has been seven days' disability was held to be inapplicable, as a measure relating to temporary disability.

The old Court of Errors and Appeals read the statute as intending that compensation for an occupational disease, in that case benzol poisoning, be determinable "when the disability or death occurred"; compensable "disability" from an occupational disease "must necessarily occur when the employee is incapacitated for work." *Textileather Corporation v. Great American Indemnity Co.,* 108 *N. J. L.* 121

(*E. & A.* 1931). See also *Natural Products Refining Co. v. Hudson Common Pleas,* 123 *N. J. L.* 522 (*Sup. Ct.* 1940), affirmed 125 *N. J. L.* 309 (*E. & A.* 1940); *Belanowitz v. Travelers Insurance Co.,* 123 *N. J. L.* 574 (*Sup. Ct.* 1940), affirmed 125 *N. J. L.* 301 (*E. & A.* 1940); *Koval v. Natural Products Refining Co.,* 25 *N. J. Misc.* 489 (*Sup. Ct.* 1947).

And in a review of the cited cases, this court, Mr. Justice Case speaking, held that "* * * the status of compensability from such an occupational disease as chrome poisoning may be attained when * * * a definite fault akin to a traumatic injury occurs." *Calabria v. Liberty Mutual Insurance Co.,* 4 *N. J.* 64 (1950).

There was no such showing here, that is to say, a definite fault akin to a traumatic injury, but rather a continuing, progressive occupational disease—although not then known to be such, even by the attending physicians—that culminated in disability total in character and permanent in quality and only then became compensable as such, at a time when berylliosis was a compensable occupational disease under a system of compensation that had had the parties' prior mutual acceptance. This is not a case of a known partial permanent injury as, *e. g.* in *Sutkowski*—see also *Cleland v. Verona Radio, Inc.,* 130 *N. J. L.* 588 (*Sup. Ct.* 1943)—but the consequence of a progressive occupational disease from successive exposures to a poisonous element that becomes compensable when it becomes disabling. It is disability that is to be compensated, not the mere loss of physical function that detracts from the former efficiency of the body or its members in the ordinary pursuits of life and yet has had no immediate effect upon earning power.

In principle compensation, apart from medical benefits, is a recompense, not for physical injury as such, but for "disability" ensuing from such injury; "[f]ixed payments for loss of specified members are due even if the claimant during the period is back at work at higher wages than before"; the loss is measured in terms of permanent disability, even though there be no immediate impairment of

earning ability, described as a benefit of "arbitrary character," yet a disability from a service-induced injury that presumably affects earning capacity. *Larson, Workmen's Compensation Law, sections* 2.40; 57.10. See also *section* 95.21.

This concept of disability benefits for an occupational disease is implicit in the limitation periods, *N. J. S. A.* 34:15–33; 34:15–34, made to run from the time when the employee's exposure to the disease shall cease or within the given time after the employee knew or ought to have known of the nature of his "disability" and its relation to his employment, whichever period is later in duration.

Indeed, appellant's counsel argues, citing *Church of Holy Communion v. Paterson Extension R. R. Co.*, 66 *N. J. L.* 218 (*E. & A.* 1901), that here the "exposure was the wrongful act and the beryllium poisoning, which was manifest, when ascertained, in July 1951, was the injury—the loss resulting from that wrongful act," and there was "then and only then, in July 1951, a coalescence or combination of *'damnum* and *injuria'* giving rise to a cause of action at law," and the two-year limitation period did not begin to run until then. And, as said, it was stipulated that the "beryllium did not develop in [the stricken employee]" until after January 1, 1950.

Certain it is that when disability became a fact, subsequent to January 1, 1950, the extended occupational disease coverage under section 2 of the Compensation Act had become an integral part of the contract of service, and the compensation thus afforded is the exclusive measure of relief, by the employee's own choice. The employment continued after January 1, 1950, and service as well. We need not consider now whether these are in themselves conclusive considerations.

█ And it goes without saying that the statute, so applied, does not infringe constitutional principle.

A petition for compensation under section 2 of the statute is pending in the Compensation Bureau, awaiting the outcome of these proceedings.

We have no occasion to review the holding of the Appellate Division that on the contrary hypothesis the last wrongful act occurred in October 1949, when the employee was last exposed to beryllium, and thus "the injury occurred prior to January 1, 1950," and if she suffered "a definite bodily impairment as a result of beryllium" before then, an action in tort for negligence would be barred by the Limitation Act.

By force of the statute itself, the limitation period in proceedings for compensation does not begin to run until the employee knows or ought to have known the nature of his disability and its relation to his employment. See *Urie v. Thompson,* 337 *U. S.* 163, 69 *S. Ct.* 1018, 93 *L. Ed.* 1282 (1949). The injustice of the rule barring actions in tort for negligence in a comparable context unless brought within two years after the cause of action shall have "accrued" was long since demonstrated by Justice Oliphant, then sitting in the old Circuit Court, in *Hughes v. Eureka Flint and Spar Co., Inc.,* 20 *N. J. Misc.* 314 (*Cir. Ct.* 1939). And see *Weinstein v. Blanchard,* 109 *N. J. L.* 332 (*E. & A.* 1932); *Church of Holy Communion v. Paterson Extension R. R. Co., supra;* also *Emerson v. Gaither,* 103 *Md.* 564, 64 *A.* 26, 8 *L. R. A., N. S.,* 738 (*Ct. App.* 1906). It would seem that a concession to fairness is indicated where one, through no fault of his own, does not know and cannot know of his cause of action until after the limitation period has expired. It is a matter of accommodating competing considerations of policy, between repose against stale claims and the prejudicial consequences of undue delay and the just rights of the injured person who did not have and could not have had timely knowledge of his right of action, ordinarily a legislative function.

As to policy, in *A'Court v. Cross* (1825), 3 *Bing.* 329, 332, Best, C. J. said: "Long dormant claims have often more of cruelty than of justice in them." And more recently, in *Board of Trade v. Cayzer, Irvine & Co., Ltd.,* [1927] *A. C.* 610, 628, Lord Atkinson declared: "The whole purpose of the Limitation Act is to apply to persons who

have good causes of action which they could, if so disposed, enforce, and to deprive them of the power of enforcing them after they have lain by for a number of years respectively and omitted to enforce them. They are thus deprived of the remedy which they have omitted to use."

Affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices HEHER, WACHENFELD, BURLING, JACOBS and PROCTOR—6.

*For reversal*—None.