ADAM F. BOBER, PETITIONER-APPELLANT, v. INDEPEND-
ENT PLATING CORPORATION, A CORPORATION OF
NEW JERSEY, RESPONDENT-RESPONDENT.

Argued October 6, 1958—Decided November 3, 1958.

*Mr. Alfred C. Clapp* argued the cause for petitioner-appellant (*Messrs. Schwartz & Schwartz,* attorneys).

*Mr. Edward B. Meredith* argued the cause for respondent-respondent.

The opinion of the court was delivered by

FRANCIS, J. Petitioner Adam F. Bober was awarded compensation by the Division of Workmen's Compensation under the occupational disease statute, *N. J. S. A.* 34:15–31. The County Court affirmed but the Appellate Division reversed on the ground that the proof failed to provide the necessary factual support for the judgment.

## I.

### COMPENSABILITY.

The respondent Independent Plating Corporation is engaged in various types of metal plating work, including chrome plating. During the period with which we are concerned, one building of the plant contained a large room 50 feet wide in which, according to Bober, there were 40 or 50 large tanks. (The plant foreman thought the number was about 75.) This room, called the plating room, was divided into two sections by a partition which extended from the floor to within a few feet of the ceiling. Among the tanks on one side of the partition were three devoted to chrome plating. When the chrome tanks were in operation, electrically generated heat was applied to the acid solution therein during the plating process. This caused a brownish spray or mist to be given off; it was described by the employer's foreman as a chromic acid solution. Apparently it was somewhat caustic in nature because if it got into a cut on an employee's hand, it would burn. The spray and fumes were supposed to be drawn off by ducts and carried up through the roof. However, the evidence reveals without dispute that the equipment was not adequate to remove all of the emission with the result that it settled and dried

out to a brown dust or powder. Deposits of it were visible on the steam pipes, lights, tops of the ducts, windows and window sills, equipment and on the floor. Respondent's principal factual witness, the plant foreman, said: "there is quite a bit of brown around there. I wouldn't say all of it comes from the dust or spray. I say a lot of it comes from when they wash down the tanks. When they take the piece parts out acid falls on the floor and gets around on different parts of equipment." The "chrome acid dust," a fine powder, would be on the clothes of men who worked on or around the tanks; one such person referred to a very light film on his skin. Testimony was introduced that the partition referred to was installed because of complaints by workers that the fumes got into "other parts of the shop."

On the roof there were two fan-type blowers designed to draw off the fumes and vapors. Each of these had 30 blades which at intervals became so heavily caked with the chrome dust that the operation of the blowers caused the building to vibrate. This would necessitate scraping and brushing 'the blades to free them from the caked dust. The workman engaged in the task was exposed to flying powdery dust. Moreover, he was allowed to stop only one blower at a time, and, as the other one was located only about a foot and a half away, the fumes and dust would be blown directly in his face.

 Bober entered this working milieu on June 15, 1951. Prior thereto he had been in good health. He had never been bothered with "sneezing or nose running," persistent congestion in his head, or anything like rose fever or hay fever. And no medical attention had ever been sought for any such conditions. But he did bring with him a latent predisposition to allergic bronchial asthma. Of course, such a constitutional weakness does not militate against his right to compensation benefits. It is common doctrine that an employer takes an employee as he is, subject to all the weaknesses and the infirmities he possesses, even though they render him more susceptible to injury or disease. *Duncan v. T. I. McCormack Trucking Co.*, 43 *N. J. Super.*

352 (*App. Div.* 1956); *Reynolds v. Public Service Co-ordinated Transport,* 21 *N. J. Super.* 528, 537 (*App. Div.* 1952), certification denied 11 *N. J.* 214 (1953). He was engaged as a maintenance man, "doing all the maintenance work, pipe fitting, electrical work and repairing of tanks, setting up tanks" and cleaning the blowers. The foreman called him a "Mr. Fix-it," an "all around man." His duties took him around the chrome tanks and above them at times. They required him to scrape and clean the dust off the blower fans and when he did this, the chrome dust was blown in his face and settled on his clothing; some was inhaled and when he blew his nose the handkerchief took on a brown discoloration. This latter experience occurred during the ordinary course of his tasks in the tank area. There is a dispute in the testimony as to the percentage of his working hours spent in the vicinity of the acid dust. The conflict need not be resolved. The fact of exposure is plain and, if the medical testimony is credible, it was sufficient to bring about the injurious results.

Shortly after the inception of his work around the chrome·plating area, Bober began to sneeze. On mentioning it to others (including the foreman of the chrome tanks), they would "just laugh" and say, "Oh, you'll get used to that." But he did not grow accustomed to it. The sneezing grew progressively worse, his nose began to run, and he started to cough and wheeze. "Not too long" after Bober started there, the foreman noticed that occasionally he would cough, and the cross-examination indicated that later on at times "he could hardly stop coughing." The conditions seemed to be present when he was active in the chrome tank area; at night and over weekends at home he felt better.

As the employment continued, the coughing spells increased in frequency and intensity and were accompanied by wheezing and occasional vomiting. On October 6, 1953 Dr. Archie K. Ged, his family physician, was consulted. This doctor is not a specialist in allergies and had no formal training in the field, although he testified that 30% of his practice consisted of allergy cases. Bober was found to be

suffering from a rather marked allergy type bronchial asthma and to be allergic to wool, chocolate, coffee, spices, feathers, ragweed, animal dander, kapok, and house dust. Doctor Ged treated him until December 7, 1953, after which he did not return. According to Bober, the distress had not been relieved, so he went to a Doctor Silver, who subsequently sent him to Dr. Aaron Weiner, a specialist in the treatment of allergies.

Doctor Weiner first saw the patient on April 14, 1954, and treated him until the December 1954 termination of Bober's employment with respondent and thereafter down to the time of the hearing of this cause. When he went to Doctor Weiner, Bober testified, he was not able to sleep at night without medication, he had shortness of breath, wheezing and difficulty in breathing. In the morning he would feel better, but in the afternoon at work the coughing and wheezing would begin. At times during the spells, vomiting occurred. Finally, at the doctor's recommendation, he left his employment, telling the president of the company that every time he "worked in the shop [he] went home sick." Since leaving he has improved.

As of the date of the trial, petitioner was still suffering from shortness of breath; he tires easily and is unable to walk very far; occasionally at night on retiring, the wheezing recurs for half hour periods and it is necessary to sleep on two pillows. Apparently after the cessation of employment in December 1954, he did no work until the beginning of 1956, when he undertook light jobs for himself about two or three days a week.

Doctor Weiner found substantially the same allergies as Doctor Ged. His diagnosis, after (as he described it) intensive delving into history, was allergic rhinitis (inflammation of the mucous membrane of the nostrils) and bronchial asthma. And he expressed the opinion that the chromic acid dust to which Bober was exposed was the factor responsible for the allergic bronchial asthma. The causation mechanics were explained in this way: The patient had a latent allergic state. Although the dust was not an allergen,

or at least not one to which Bober was allergic, it was an irritant which sensitized the dormant condition and brought it into an active allergy.

Dr. Albert B. Tucker was produced as an expert witness on behalf of respondent. His specialty is cardiopulmonary disease and not allergies, although his testimony was to the effect that his field includes treatment of the latter conditions. He made an examination on one occasion, March 2, 1955, at which time he found no evidence of asthma and considered that Bober was "in excellent general condition." At this point, the sharp conflict in the medical proof becomes evident. The notes of Doctor Weiner, who was actively treating Bober, bring it into sharp focus. They show:

"2/23/55 * * * Tires easily—wheezes on slight exertion.
3/4/55 wheezes at night and brings up phlegm in A. M."

On the basic problem in the case, it was Doctor Tucker's opinion that an active allergic bronchial asthma could not be "triggered" by an irritant such as the chrome dust. It could be precipitated only by an allergen to which the patient is hypersensitive. He felt that Bober's asthma was produced by an abnormal response to ragweed pollen to which he was allergic, that the condition was a classical example of the disease and that there was no causal relationship between the dust and the active allergic state. He conceded that if an allergic bronchial asthma existed, a nonallergen irritant could aggravate the condition as a secondary agent. In this connection, the following questions and answers appear:

"Q. All right. Doctor, one further question along that line. Would the fact that this patient felt well in the morning, came to work and as the day wore on toward the end of the afternoon he became more adversely affected, he felt very bad, he found more difficulty in breathing and that when he went home by the evening he seemed to improve and by the morning he felt better yet, and also the fact that on weekends when he was not near the plant he felt better, would those facts be of any significance to you?
A. If they are indeed factual, they would be significant.

Q. Would they indicate the probability that the environment of his employment was affecting him?

A. If indeed factual, they would so indicate."

A competent secondary irritant "should produce a classical full-blown paroxysm." But it would be a temporary incident or aggravation and if the irritant were present in the employment environment, termination of the exposure would restore the worker to his preexisting physical status without any permanent effects.

Manifestly, these opposing medical opinions cannot be considered apart from the factual framework of the entire case. Their probative force must be evaluated by a number of factors. In the process of evaluation, a criterion of recognized significance is the greater opportunity of a treating physician, as compared with a doctor who conducts a single examination in order to become an expert medical witness, to know, understand and decide upon the producing cause of the patient's condition. *Fusco v. Cambridge Piece Dyeing Corp.*, 135 *N. J. L.* 160, 162 (*E. & A.* 1947). And it cannot be overlooked that Doctor Weiner, a specialist in allergies, had Bober under his observation and care from April 1954 down to March 8, 1956, the hearing date, and that the treatment had not yet ceased.

Furthermore, as has been indicated, petitioner asserted that he was in good health and untroubled by asthma prior to this employment exposure. There is nothing in the record which negatives that testimony. The deputy director and the County Court accepted it as credible and the opinion of the Appellate Division makes no contrary finding. We discern no reason for depriving it of full probative force. Soon after the employment exposure began, symptoms of response to the chrome dust as an irritant manifested themselves with temporary relief at the end of the work day and over weekends. The reaction continued and grew worse until, on the doctor's orders, the employment ended, after which the total disability which existed at that time reduced itself to half the amount. This sequence, also considered worthy of

168

belief by the original triers of the facts, bespeaks more strongly of cause than· of mere coincidence. *Schust v. Wright Aeronautical Corp.,* 7 *N. J. Super.* 54 (*App. Div.* 1950), certification denied 5 *N. J.* 177 (1950). Nor can it be overlooked that the deputy director, who had the opportunity to see and hear the medical witnesses, found Doctor Weiner's testimony believable and his diagnosis consistent with the facts, while Doctor Tucker's opinion as an expert witness was said to contain "unrealistic aspects." We find no substantial reason for disagreement. One such aspect may be noted. On the basis of a hypothetical question which included the treatment given by Doctors Ged (who testified in behalf of respondent) and Weiner, Doctor Tucker said he accepted "this case as one of classical, moderately severe bronchial asthma triggered off by the stipulated antigens," (that is, the allergens to which petitioner was sensitive). Later, on being asked to give the percentage of cases in which bronchial asthma is cured, he replied: "I don't consider that bronchial asthma is ever cured." Yet on his one examination in March 1955 he found no evidence of asthma, no disability, and that Bober was "in excellent condition."

A petitioner is not required to prove his claim to a certainty. It is sufficient if the evidence establishes with reasonable probability that the employment caused or proximately contributed to the condition of disease of which he complains. *Ciuba v. Irvington Varnish & Insulator Co.,* 27· *N. J.* 127, 139 (1958). After reviewing the record and giving due respect to the opportunity of the deputy director to evaluate the witnesses, we conclude that the preponderance of the evidence supports the conclusion that the chrome dust to which Bober was exposed in the course of the employment acted as an irritant upon his latent disposition to allergy, and activated it so as to be responsible in compensation for the resultant allergic bronchial asthma. No specific argument is made that the finding of 30% of total permanent disability is not warranted and we have not undertaken to review it.

In reversing the two lower tribunals, the Appellate Division indicated that the outcome of the contest depended upon a choice between the two medical experts, Doctors Weiner and Tucker. It disparaged Doctor Weiner's answer to the hypothetical question put to him because his statements revealed that his opinion was predicated partly on facts which were either not proved or disproportionate in degree to those proved. There was no objection to the question nor to the answer and presumably the court elected to treat the matter as plain error. In our own study, the facts set out in the hypothetical question have been compared with the plaintiff's testimony and the history given to Doctor Weiner as a treating physician, and we perceive no difference of such degree as would justify disregard of his conclusion on the subject of causal relation.

In addition, the Appellate Division's opinion reflects adversely upon Doctor Weiner's integrity. This is posited upon a change in one place in his detailed handwritten notes of the history and long course of treatment and a similar change in a typewritten letter to petitioner's attorney, dictated some months after the filing of the petition. The alteration referred to was the superimposition of the figure "1" over the "0" in "June 1950" to make it "June 1951." The doctor explained that the original zero was an unconscious mistake and in our view the inferences *contra* are not sufficient to warrant the imputation of dishonesty and fraud. The typewritten letter referred to furnished the attorney with an elaborate review of the case and the alteration complained of appears near the bottom of the second page as part of a summary of the matter. The criticism of that change overlooked the fact that on the first page at the beginning of the letter the doctor had dictated:

"* * * Mr. Bober stated that in *June 1951* and continuing to the first week of July of that year," etc.

Thus an equally valid conclusion would be that the alteration in the summary was simply the correction of an inadvertent error. The same may be said of the handwritten seven pages

of notes made by the doctor during the period of treatment. Near the top of the first sheet is found "June 1951—Independent Plating," followed by history including references to the work of petitioner. At about the middle of the page appears the allusion to the onset as June 1950, changed to 1951. While the impression of the reason for imposing the "1" over the zero is perhaps not so clear in this instance, when the context is considered, we cannot attribute it to such an odious motive.

## II.

### ADMISSIBILITY OF THE HISTORY GIVEN BY PETITIONER TO DOCTOR WEINER AS A TREATING PHYSICIAN.

The Appellate Division seems to have rested its reversal upon a determination that it was improper for Doctor Weiner to base his opinion in part upon some of the history given to him by Bober. Although no proper objection was made at the trial, and although in any event we would find no prejudicial error because the facts which were given as part of the history were already in the record through the petitioner's testimony, we put these facts aside in order to deal with the meritorious issue.

We have long held the view in this State that declarations of a patient as to his condition, symptoms and feelings, made to his physician for the purpose of diagnosis and treatment, are admissible in evidence. Departure in this respect from the hearsay rule has been sanctioned because the law recognizes that such statements spring from natural reflexes and are made at a time when the desire for relief furnishes an impelling incentive to truth telling. *State v. Gruich*, 96 *N. J. L.* 202 (*E. & A.* 1921). But it has been said in general terms also that statements as to the cause of the symptoms or condition are not relieved of the hearsay ban because the same compelling motivation may not be present; they may be the product of ulterior considerations. *Helminsky v. Ford Motor Co.*, 111 *N. J. L.* 369 (*E. & A.* 1933). And respondent urges here that Bober's statements

in the history given to the doctor as to the chrome dust environment in which he worked and his physical reactions to it do not constitute revelation of factors necessary for diagnosis and treatment, but rather declarations relating to the cause of those factors. It is true that in a sense the statements relate to cause, but in this type of situation they cannot be denied either admissibility or probative force for that reason. As can be seen readily upon analysis, they stand arrayed in the same cloak of reliability as those expressions which are thought of ordinarily as symptoms.

According to Doctor Weiner, in allergy cases the patient may be sensitive to many antigens. And, as Doctor Tucker said, an allergic state which has been activated may be aggravated by a "host of secondary factors." Moreover, if a latent allergic condition is activated by specific allergens or irritants, it is undisputed that part of the treatment consists of removal of the sufferer from the offending environment. Consequently, on being consulted, the doctor must seek out the particular allergen or allergens or irritants which are responsible for the condition, and the place of exposure, if a particular location can be isolated. The record indicates that in some instances when an allergen to which the patient is hypersensitive is in season in an area, the treatment consists in part of a vacation in or removal to another part of the state or country. And so, much more consideration must be given to history than in the diagnosis and care of other kinds of ailments or injuries.

As Doctor Weiner put it:

"The history is the most important method of diagnosing an allergic condition, and among the allergic conditions, of course, allergic rhinitis and bronchial asthma. Roughly 80, to 90% of the diagnosis depends on a history well taken. A history at the first sitting takes at least one hour and there usually are three or four subsequent sittings at which at least 15 minutes is spent in history. The history is asked in detail, hashed and rehashed in such a manner that it becomes clear to the doctor that the history is accurate in its general detail.

Q. Did you take such histories, Doctor, in this case?

A. In this case the initial history took at least one hour, and I saw this man subsequently for the following months about five or

six times and I talked to him for at least 15 or 20 minutes on the history. I was convinced that the history that I had was quite accurate, and from this history, of course, I was able to infer that this was probably an allergic condition, probably allergic rhinitis and asthma."

And further:

"In taking a history, it's important to study the environmental factors in the patient's life. We have to go through everything he does practically from morning to night, where he lives, and so on."

█ It is evident that the answers and information given by the patient during the doctor's probing for possible causes of the condition have the same driving and spontaneous motivation for truthfulness as in the usual case to be found in the reports where the hearsay exception has been recognized. In our judgment, therefore, the history thus gleaned which described the inception, the general character of the cause or external source of the condition to be treated, so far as it is pertinent to the purpose of diagnosis and treatment, is within the rule and admissible as substantive evidence. *Cf. McCormick on Evidence,* 564 (1954); *Stewart v. Baltimore & O. R. Co.,* 137 *F. 2d* 527, 530 (2 *Cir.* 1943); *Baker v. Industrial Commission,* 44 *Ohio App.* 539, 186 *N. E.* 10 (*Ct. App.* 1933); *Dabbert v. Travelers' Ins. Co.,* 13 *Ohio Dec. (Reprint)* 792 (1870); *Ferne v. Chadderton,* 375 *Pa.* 302, 100 *A. 2d* 854 (1953); *Hammond v. Industrial Commission,* 84 *Utah* 67, 34 *P. 2d* 687 (1934). Accordingly, there was no error in receiving in evidence the portions of the history of which complaint is now made.

## III.

### THE PROBLEM OF STATUTORY COVERAGE.

█ Respondent contends that petitioner's ailment should not be deemed covered by the occupational disease section of the workmen's compensation legislation.

The statute, *N. J. S. A.* 34:15–31, provides:

"For the purposes of this article, the phrase 'compensable occupational disease' shall include all diseases arising out of and in the course of employment, which are due to causes and conditions which are or were characteristic of or peculiar to a particular trade, occupation, process or employment, or which diseases are due to the exposure of any employee to a *cause* thereof arising out of and in the course of his employment." (Emphasis added.)

The suggestion is that this claim cannot be considered compensable unless the chrome dust constituted an allergen, *i. e.*, a substance to which Bober was allergic. In other words, unless the allergic bronchial asthma was directly produced by a dust possessing the inherent and recognized capacity to create an asthma of that type, the exposure was not "to a cause thereof arising out of and in the course of" the employment. But the legislative language, which demands liberal construction to the end that its beneficent purposes be served, does not justify such a constricted interpretation. Under the proof here, the chrome dust was an irritant which so sensitized the latent allergic bronchial asthma as to cause it to move from the dormant to an active state. If it were not for that employment exposure, the predisposition would have remained quiescent. So the dust must be treated as a cause in the legal sense and thus to satisfy the mandate of the statute. *Cf. Duncan v. T. I. McCormack Trucking Co., supra; Giambattista v. Thomas A. Edison*, 32 *N. J. Super*. 103, 114 (*App. Div.* 1954); *Le Lenko v. Wilson H. Lee Co.*, 128 *Conn*. 499, 24 *A. 2d* 253 (*Sup. Ct. Err.* 1942); *Grain Handling Co. v. Sweeney*, 102 *F. 2d* 464 (2 *Cir.* 1939), *certiorari* denied 308 *U. S.* 570, 60 *S. Ct.* 83, 84 *L. Ed.* 478 (1939).

The *Grain Handling Co.* case arose under the *Federal Longshoremen's and Harbor Workers' Compensation Act*, 33 *U. S. C. A.* § 901 *et seq.*, which does not have as comprehensive a definition of occupational disease as is contained in our law. The Second Circuit Court of Appeals held that a disability caused by the activation of a dormant tuberculosis

as the result of inhalation of grain dust in ships' holds, was such a disease. Judge Learned Hand had this to say:

"I can see no difference between a fresh infection and the awakening of an old one. The statute is not concerned with pathology, but with industry disability; and a disease is no disease until it manifests itself. Few adults are not diseased, if by that one means only that the seeds of future troubles are not already planted; and it is a common place that health is a constant warfare between the body and its enemies; an infection mastered, though latent, is no longer a disease, industrially speaking, until the individual's resistance is again so far lowered that he succumbs."

The process of statutory interpretation falls short of its high function if a strict reading of this section of the Workmen's Compensation Act results in a narrowing of the coverage which a less literal reading would preserve.

The judgment of the Appellate Division is reversed and the award of compensation is reinstated.

*For reversal*—Chief Justice WEINTRAUB, and Justices WACHENFELD, BURLING, JACOBS, FRANCIS and PROCTOR—6.