66 N.J. Super. 135 (1961)
168 A.2d 670
GEORGE BROOKS, PETITIONER-APPELLANT,
v.
BETHLEHEM STEEL COMPANY, RESPONDENT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued December 5, 1960.
Decided March 8, 1961.
*136 Before Judges CONFORD, FREUND and KILKENNY.
Mr. Robert C. Gruhin argued the cause for petitioner-appellant (Mr. Frank J. Guarini, Jr., attorney).
*137 Mr. John F. Lynch argued the cause for respondent-respondent (Messrs. O'Mara, Schumann, Davis and Lynch and Mr. James Dorment, Jr., attorneys).
The opinion of the court was delivered by CONFORD, S.J.A.D.
This is a workmen's compensation claim for occupational disease allegedly contracted by petitioner as a "burner" in the employ of respondent at its Hoboken yard since 1946. The petition was filed in August 1954. After hearings early in 1959 a determination adverse to petitioner was rendered by the Division of Workmen's Compensation July 29, 1959, and affirmed by the Hudson County Court May 6, 1960. There is no explanation in the record for the long delay in disposition of the matter in the Division beyond the apparent circumstance that this was one of a number of similar claims by other employees of the same employer.
Petitioner testified that he began work for respondent in good health, and after passing a physical examination. Part of his work involved burning metal on ships, sometimes oil-covered or painted, and in the closed compartments of ship bottoms. The resulting fumes began to make him sick, periodically, from late 1948 on. The symptoms, such as coughing, wheezing, running nose and bloody emissions from his throat, continued until his examination by Dr. Potter in 1954, about the time of the filing of the petition, and thereafter until and as of the period in 1959 when the hearings in this case were taking place. Dr. Potter found petitioner to be suffering from emphysema and other chest conditions.
The deputy director in the Division found that petitioner's disability arose in 1948; that the petition was barred by statutory limitations and also by the circumstance that if petitioner suffered, as claimed, from an occupational disease, it arose prior to the effective date of the act making all occupational diseases compensable, January 1, 1950 (L. 1949, c. 29; N.J.S.A. 34:15-30, 31), and was *138 therefore non-compensable under the act, according to the interpretive cases. McBride v. Royal Laundry Service, Inc., 44 N.J. Super. 114 (App. Div. 1957); and see Biglioli v. Durotest Corp., 26 N.J. 33 (1958). The County Court decided that the disability attained compensable status in 1948 and that the claim was barred for failure to file it within the statutory period.
We at once dispose of the issue of limitations. Both sides on this appeal agree that the claim is not barred by the statutory limitation for the dispositive reason that petitioner was still employed by respondent in the same kind of work as allegedly produced the disability, and thus still exposed to the same occupational disease, at the time he filed the petition. N.J.S.A. 34:15-34.
Respondent seeks to justify the result in the trial tribunals on three grounds: (1) petitioner's condition antedated the effective date of the occupational disease provisions of the act and is therefore non-compensable; (2) in the alternative, whatever condition petitioner has is not compensable because it has not yet produced disability equivalent to inability to work, asserted to be a prerequisite for compensability for this kind of progressive disease under the interpretation by this court of the statute and authorities in Bucuk v. Edward A. Zusi Brass Foundry, 49 N.J. Super. 187 (App. Div. 1958); certif. den. 27 N.J. 398 (1958); and (3) there was no causal relationship between the work and the condition.
There is no doubt that if petitioner's condition physiologically reached the stage at which an occupational disease is compensable as a matter of law, by a date antecedent to January 1, 1950, it cannot be the subject of a compensation award in this case. Prior to that date the act covered only such occupational diseases as were expressly scheduled therein, and petitioner's condition was not a disease so scheduled. Non-scheduled occupational diseases became compensable for the first time as a result of the enactment of the 1949 statute cited above, and since that act was solely *139 prospective in effect and did not by its terms take effect until January 1, 1950, it has been held that it covers only those conditions which arose (attained the physiological stage of compensability) subsequent to that date. McBride v. Royal Laundry Service, Inc., supra; Giambattista v. Thomas A. Edison, 32 N.J. Super. 103 (App. Div. 1954).
We address our attention first to the defense of absence of causal relationship. The discussion of the facts thereby required will facilitate an understanding of our disposition of the other issues as well.

I.
In discussing petitioner's testimony, it must be noted that he had considerable difficulty in understanding counsel and in intelligible response. These difficulties have created problems in analysis of the proofs, which we have dealt with as best we could.
Although petitioner's original hiring in 1946 was preceded by an examination at which he was found to be in good health, it does not appear whether this included X-rays. He had been a burner for the same company before, working in other yards of the company from 1941 to 1944. He was in the armed forces for a period thereafter before resuming work with respondent at Hoboken.
Petitioner's working hours were from 4:15 P.M. to 1:15 A.M., with a half-hour rest period. The burning consisted of the application of a flame from a torch to metal. Sometimes this was done in the open air or in the machine or plate shops. 25% of his working time was spent on ships, and most of that in holds or inner bottoms. Metals burned included galvanized iron, copper and black iron. This process, especially in the holds or bottoms, produced heavy fumes emanating from the metal or the oil or paint covering it. At times the fumes were smoky enough to bar vision as close as three feet. The workers were equipped with masks, but they frequently were out of *140 repair; in the confined areas it was too close to wear them more than a half-hour at a time. Breathing the fumes made the petitioner periodically sick, at first for short periods, then for periods ranging from three to four days to a week.
About Christmas 1948 petitioner began to "get myself a heavy wheeze and cough and blood comes off my throat and my nose is running continually." There was testimony concerning difficulty in breathing, but lack of clarity as to when it began. On cross-examination he mentioned coughing out "stuff so thick, black." These conditions continued from 1948 "until now." Frequently questions, on direct and cross-examination, addressed to conditions as of 1948 and 1949, were answered by the witness in terms of later periods. Whether such responses were the result of design rather than lack of understanding is difficult to say.
The employer's medical dispensary supplied petitioner and other workers with similar symptoms a drink the men called a "pink lady," later in the hearing identified as a kaopectate. The medicine usually relieved him enough to resume work.
Between 1946 and 1954 petitioner had no physical examination. In 1954, he testified, "I beginning to notice that in the night time when I go to sleep I wheeze." He heard singing sounds in his ear. "You can hear me breathe up or down from that time on." Apparently the volume of the coughing, bleeding from the nose or throat and his running nose became greater, "sinuses like running all the time * * *. It brings much more worser when you keep on working." His breathing became affected "very, very much * * *. You're breathing just like you breath a heavy weight from here. The throat is so stuffed up with stuff, and you got to cough * * *. Your eyes is crying, everything else."
In 1954 petitioner consulted an attorney and filed a petition for compensation in August of that year. He was then 48 years of age. He was examined on August 8, 1954 by Dr. Benjamin P. Potter, an outstanding specialist in chest *141 diseases. Dr. Potter testified that the physical examination showed rales and wheezes of the lower portion of the chest. The X-ray showed, in part, "deep costophrenic sinuses, a large adhesion in the right leaf of the diaphragm and the pleura." His diagnosis at that time was "1. emphysema and fibrosis; 2. chronic bronchitis; and 3. chronic pleuritis." ("Emphysema" is either "presence of air in the tissues" or a "stretching of the air spaces in the lung." 5 Lawyers Medical Cyclopedia (1960), p. 740.) The doctor evaluated petitioner's permanent disability as of 1954 at 20% of total and concluded, on the basis of a hypothetical question, that there was causal relation between the conditions found and the employment.
Dr. Potter re-examined petitioner April 23, 1957 and April 21, 1958. The 1957 findings "were not essentially different" from those of 1954. The degree of disability was the same. The 1958 physical, fluoroscopic and X-ray studies showed no change. In 1958 the doctor for the first time made respiratory studies of vital capacity and maximum breathing capacity which showed substantially less than normal. On cross-examination the doctor said the condition had been static during the period 1954-1958. He well withstood searching cross-examination as to his conclusion of employment connection which he based on "irritation of the tracheobronchial tree and the finer bronchi, which have led to the deposition of repeated small infiltrations," and in turn the lungs became inflated by way of compensation "for the greater surface."
We will refer further to Dr. Potter's testimony in connection with respondent's contention as to when the condition became fixed.
Dr. Samuel Cohen testified for respondent. He, too, produced impressive qualifications in the field of lung and chest pathology. He examined petitioner for the first time October 13, 1956. "On listening to the chest some ronchi (sic) were audible * * *." An X-ray taken at the time showed: "The bronchovascular markings are within normal *142 limits * * *." He performed three respiratory function tests. All indicated results substantially below "predicated normal" (but described by the doctor as "within normal limits"), and fairly close to those found by Dr. Potter in 1958. Dr. Cohen conducted another examination April 21, 1958 which elicited "no abnormal signs over the lung fields." The X-ray chest examination showed the same results as the first examination. The doctor's diagnosis at the end of his first examination was "pulmonary emphysema with bronchitis" and "some adhesive pleurisy on the right * * * no fibrosis or siderosis." The diagnosis at the end of the second examination was essentially the same. One of the respiratory tests was more favorable at the second examination.
On the basis of his 1958 examination Dr. Cohen arrived at an estimate of disability of 3% of total. On the basis of a hypothetical question the doctor gave it as his opinion that petitioner's condition was not "directly" related causally to his occupation. The adhesive pleurisy was found to be the result of an "old infectious process" which remained constant between 1956 and 1958. The emphysema, which was "small in amount and limited to both lower lung fields," was found to be "entirely compatible with this man's age." There was no X-ray evidence of dust in the lungs. The doctor's opinion was that petitioner had merely had occasional bouts of metal fume fever from exposure to zinc fumes from galvanized iron; and that the symptomatology was temporary and responded to administration of kaopectate. The doctor conceded, on cross-examination, that an individual "may" develop emphysema and bronchitis from such exposures to fumes as petitioner had been subjected to.
It may be noted that Dr. Cohen testified that petitioner gave him a history including some of the symptoms he related on direct examination, dating back to 1947. He mentioned an 11-day hospitalization at St. Mary's Hospital in Hoboken in 1954, induced by symptoms of vomiting and expectoration of "black stuff," after which he was examined *143 by Dr. Potter. But we called for the St. Mary's Hospital records after argument, and these indicate only a hospitalization from December 29, 1954 to January 3, 1955, and that for severe abdominal pain accompanied by vomiting. Nothing in the hospital records indicates a relationship between that illness and a chest or lung condition.
Dr. Edward P. Eglee also testified for respondent. He examined petitioner March 17, 1959. He found no lung abnormality. X-ray and vital capacity tests showed no change from the results of the 1958 examination made by Dr. Cohen. Dr. Eglee's diagnosis was that there was "no pneumoconiosis" (dust in the lungs) and no permanent disability. Rather superfluously, he testified the "conditions" he found were not causally related to petitioner's occupation.
Our appraisal of the proofs satisfies us that petitioner had pulmonary emphysema and a related chest condition causally connected with his work with respondent. The proof that petitioner had no symptoms for about two years after starting the burning work at the Hoboken yard and that the symptomology described began to appear at the end of 1948, continuing thereafter until and after the filing of the petition in 1954, lends probability to the hypothesis of the accuracy of the unqualified expert opinion of Dr. Potter that there was causal connection. Cf. Bober v. Independent Plating Corp., 28 N.J. 160, 168 (1958); Masko v. Barnett Foundry & Machine Co., 53 N.J. Super. 414, 423 (App. Div. 1959), certif. den. 29 N.J. 464 (1959). Dr. Cohen's negative conclusion was qualified; he said petitioner's condition was not "directly" related to the employment. Moreover, he conceded that emphysema, while "compatible" with the man's age, "may" ensue from such exposures to fumes, etc., as petitioner experienced. Dr. Eglee's opinion of absence of causal relationship is of little weight in view of his failure to find any abnormality whatever. The preponderance of the proofs lies with petitioner on the issue of causal connection.

*144 II.
We turn to a consideration of the more difficult issues posed by the other defenses submitted. First, has petitioner's condition ever attained compensable status, in view of the fact that he never was prevented by it from continuing his work with respondent? Second, if the first question is answered in the affirmative, was such compensable status not reached prior to January 1, 1950, so as to preclude recovery under the act as amended to cover such an occupational disease as this? We first examine the problem initially posed.
In Bucuk v. Edward A. Zusi Brass Foundry, supra, we gave extended study to the matter of reconciling the two differing criteria for determining the accrual of compensable status of an occupational disease, viz., the "death or inability to work" test declared in Textileather Corp. v. Great American, &c. Co., 108 N.J.L. 121 (E. & A. 1931), and the "definite fault akin to a traumatic injury" criterion enunciated in Calabria v. Liberty Mutual Insurance Co., 4 N.J. 64 (1950). See 49 N.J. Super., at pp. 202-207. We concluded that the tests coexisted and attempted a restatement of the distinction as follows (49 N.J. Super., at pp. 206-207):
"The distinction thus adumbrated may possibly be articulated with rough accuracy as follows. When the disease is of a nature which is gradually progressive and does not manifest the kind of tangible bodily injury or impairment which is specifically demonstrable, and cognizable even by a layman, but takes its toll in a general over-all condition of malaise eventually forcing discontinuance of work at the injurious occupation, the inception of compensable status is when such discontinuance at work begins. Whether the cessation of work must be permanent is a question not susceptible of pat formulaic generalization. Where, however, the bodily impairment or injury is of the tangible quality described, we have the `definite fault akin to a traumatic injury' sufficient to attach compensable status. While not entirely satisfactory either as a matter of logic or facility of application, this differentiation serves the pragmatic objective mentioned in Textileather of preserving compensation in cases where a definite time of bodily impairment *145 is difficult to fix, while yet also permitting recovery for certain degrees of unquestionably injurious disease not necessarily accompanied by inability to work."
See also Masko v. Barnett Foundry & Machine Co., supra.
Superficially considered, the condition of the petitioner before us may seem to fall under the classification of the "gradually progressive," internal type of disease requiring inability to work before compensable status may attach. This is respondent's alternative argument in the present case. Petitioner has never had to cease work for any extended period because of his condition. If the Textileather rule applies, then obviously petitioner's disability has never reached compensable status, either prior or subsequent to January 1, 1950, and the judgment below would have to be affirmed.
However, the proofs show that at least by 1954 petitioner's condition reached a plateau of arrested development which remained substantially constant thereafter, and even as of 1959, when this case was being heard. There was a positive degree of partial permanent disability of somewhere between Dr. Potter's estimate of 20% and Dr. Cohen's estimate of 3%, notwithstanding petitioner continued on the job and could apparently continue with it indefinitely. If petitioner is to be told he cannot have an award for that disability until it prevents him from working, it is unlikely from the proofs that he will ever qualify therefor (unless he quits in bad faith to establish his claim). A denial of recovery under these circumstances would present the awkward anomaly of an indefinitely non-recoverable partial permanent occupational disability, by contrast with the unquestionable right of compensation for a partial permanent injury resulting from an occupational accident even though it does not prevent the workman from continuing to work. None of the cases applying the "inability to work" test which we discussed in Bucuk presented such a prospect  one obviously at odds with a basic feature of workmen's compensation theory and practice, and therefore to be avoided if any reasonable *146 construction of the act will permit. See Bober v. Independent Plating Corp., supra, 28 N.J., at p. 174.
It consequently appears to us that in a case of the internal, gradually progressive type of occupational disease (atypical of the ordinary "definite fault," etc. situation), once the condition has become definitely measurable, fixed and arrested, notwithstanding the petitioner remains able to work at the same job, it must be assimilated to the category of the "definite fault akin to a traumatic injury" and become compensable to the extent of the partial permanent disability then attained. It should be noted that the rule we are declaring will not compel awaiting the fullest progression of the disease in order to apply for compensation where there is previously a sufficient bodily impairment to constitute a true "definite fault akin to a traumatic injury"; e.g., impairment of hearing, as in McBride v. Royal Laundry Service, Inc., supra, 44 N.J. Super., at p. 117; or a perforated septum, as in Calabria v. Liberty Mutual Insurance Co., supra, 4 N.J., at p. 70.

III.
Having concluded that petitioner's condition eventually reached the definitely measurable, fixed and arrested stage of partial permanent disability that matured its compensability, can we also come to agreement with respondent's major thesis that such a condition is shown to have arrived prior to January 1, 1950, so as to bar the remedy under the statute? Our conclusion is in the negative.
Petitioner testified that his first onset of symptoms came at about Christmas, 1948, and we find that testimony credible. To agree with respondent's contention means to make the finding of fact that within the ensuing year (i.e., prior to January 1, 1950) this condition became fixed and arrested beyond any appreciable development from exposure subsequent thereto. The settled policy of liberal application of the Workmen's Compensation Act in favor of the workman *147 calls for resolving doubts as to whether the remedy for occupational disease became barred by accrual of the claim prior to January 1, 1950, in favor of the thesis that it did not, and that the remedy is available. McBride v. Royal Laundry Service, Inc., supra, 44 N.J. Super., at p. 118.
Here there were no X-rays or other clinical tests, prior to January 1, 1950, which by comparison with the later examinations might enable a determination whether the condition became definite and arrested prior to that date, so as to disqualify petitioner under the test of accrual we have held applicable in this kind of disease-disability. Respondent's argument reduces itself principally to an insistence upon our acceptance of petitioner's own labored and unreliable description of his symptoms before and after January 1, 1950 as determinative of the proposition that his internal condition was no worse in August 1954, when the petition was filed, than it was prior to January 1, 1950. We are unwilling to do that on so speculative and uncertain a basis. Exposure since 1946 plus symptoms over a period of four and a half years subsequent to January 1, 1950, seems to us, by the preponderance of probabilities, to spell out the conclusion of a more serious ultimate condition than what would have existed by the critical date mentioned, after only a year of symptoms and some three and a half years of exposure. The fair import of the medical testimony is that the effects of inspiration of the fumes became harmful over a rather extended period of exposure.
We do not overlook respondent's argument that Dr. Potter's testimony, not yet mentioned, to the effect that the X-ray changes he noted probably pre-existed petitioner's complaints, justified the conclusion that the 1954 X-ray changes actually existed before petitioner's 1948 symptoms. But we do not read Dr. Potter's testimony as necessarily referring to complaints of petitioner in 1948. At one point of the relevant testimony he was expressly referring to the petitioner's complaints to him, which he recorded when he examined and X-rayed him in August *148 1954. While the witness did say that, generally, a patient may have changes in a lung for about a year before he starts complaining, it would not be safe to accept this inarticulate petitioner's testimony as satisfactorily indicative of the fact that his actual symptoms and the underlying chest conditions prior to 1950 were as severe as in 1954 and thereafter. Nor did Dr. Potter's testimony necessarily imply that lung changes preceding complaints might not grow more extensive as a result of continued exposure. From all the proofs (e.g., the variance between the St. Mary's Hospital records and what petitioner apparently told Dr. Cohen about that episode) we are inclined to the view that petitioner somewhat exaggerated his pre-1950 symptoms, or confused or substituted some of the later for the earlier.
On the whole case, we find petitioner's disability was neither a "definite fault akin to a traumatic injury" prior to January 1, 1950 nor a fully matured and static condition until subsequent thereto. Consequently his condition and accompanying disability were compensable under the statute.
The Division of Workmen's Compensation did not make a determination of the degree of partial permanent disability on the conflicting proofs because of its disposition of the claim on other grounds. The deputy director (now Judge in Compensation) who heard the case is better qualified to fix such disability in the first instance than are we. The case will therefore be remanded to the Division to the end that proper awards of disability and allowances for services in that tribunal may be made. The Hudson County Court will make the allowances for services in that court and here.
Reversed and remanded.