58 N.J. Super. 353 (1959)
156 A.2d 273
CHARLOTTE GILLIGAN KASISKI, FORMERLY KNOWN AS CHARLOTTE GILLIGAN, PETITIONER-APPELLEE,
v.
INTERNATIONAL PAPER COMPANY, RESPONDENT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued March 9, 1959.
Decided June 29, 1959.
*355 Before Judges CONFORD, FREUND and HANEMAN.
Mr. John J. Monigan, Jr., argued the cause for appellant (Messrs. Stryker, Tams & Horner, attorneys; Mr. Howard G. Wachenfeld, on the brief).
Mr. Louis Winer argued the cause for appellee.
*356 The opinion of the court was delivered by HANEMAN, J.A.D.
Respondent company appeals from a judgment of the Morris County Court affirming an award by the Workmen's Compensation Division.
This matter has been twice before our Supreme Court, sub nom. Gilligan v. International Paper Co., 21 N.J. 557 (1956), 24 N.J. 230 (1957), and on each occasion was remanded for the taking of further proof.
The facts are fully detailed in the prior opinions in the Supreme Court. No need will be served by a further detailed factual recital. We adopt and incorporate by reference such factual background set forth in the Supreme Court opinion. It suffices, for purposes of the present appeal, to repeat that petitioner seeks compensation for the death of Walter W. Gilligan, who, on June 25, 1953, was found unconscious at his place of employment and subsequently, on July 28, 1953, died from the results of a ruptured congenital mycotic cerebral aneurysm. Petitioner is decedent's widow, since remarried. She originally contended that her husband's death was the direct result of a coughing spell caused by the inhalation of dust which arose from the performance of the duties of his employment while loading a starch adhesive machine with the contents of heavy bags of cornstarch, borax and flake caustics. There was no eyewitness to decedent's collapse. The sole testimony linking the employment to decedent's collapse and demise came from Dr. Stellar, a physician who treated decedent at St. Joseph's Hospital. In that connection the Supreme Court said (24 N.J. at page 235):
"There still remains, however, the troublesome issue of whether the appellant has satisfactorily carried the burden of establishing that the decedent had actually inhaled dust which had induced coughing and which in turn had brought on the rupture of the cerebral aneurysm."
And again (24 N.J. at page 238):
"The St. Joseph's Hospital record expressly set forth in Dr. Stellar's handwriting, that there had been a sudden onset 36 hours *357 ago when coughing dust at place of work,' but we do not know where Dr. Stellar received his information or the attendant circumstances. His direct examination indicated that he had obtained it from the decedent, but his cross-examination indicated that it may well have come from other sources. It seems to us that this important issue should not be permitted to remain in doubt; it may be clarified by having the Division take additional testimony and make appropriate findings thereon. Dr. Stellar should be carefully examined as to the source of his information and the circumstances under which it was received, and the parties should have full opportunity to introduce before the Division any additional testimony which may shed further light as to whether there was a causal connection between the decedent's work and his collapse at the respondent's plant on the morning of June 25, 1953."
As a result of the remand, additional testimony was taken before the Workmen's Compensation Division. The Deputy Director found, after hearing the testimony, that Dr. Stellar received the history in question from decedent. He made the following formal finding:
"The petitioner's husband was in the employ of the respondent on June 26, 1953, on which date he sustained personal injury as the result of an accident arising out of and in the course of his employment, and died as the result of said accident on July 28, 1953. The accident and injury occurred as follows:
`While working on a starch machine, inhaled dust from the ingredients used in said starch machine, which dust caused a coughing spell, and deceased sustained a ruptured aneurysm.'"
Upon appeal the County Court affirmed.
At the hearing of the case under the remand petitioner sought to establish an alternative theory for the decedent's collapse  that it was due to the physical exertion of lifting the heavy bags. For this purpose she posed a hypothetical question to Dr. Stellar and sought thereby the physician's opinion on the probability that the rupture of the aneurysm resulted from decedent's physical exertion attendant upon the loading of the mixing machine with the bags of cornstarch, borax and caustic; the carrying of the empty starch bags to a baler, the baling of them; and the cleaning of the platform with a broom. Respondent objected to the question on the ground that it presented a new theory and *358 one outside the scope of the remand. The Deputy Director, however, permitted Dr. Stellar to answer. Petitioner now urges this theory as an additional ground for recovery.
Respondent urges, inter alia, that (1) the testimony does not sustain the hypothesis that the decedent died as a result of coughing dust at his place of work; (2) the remand limited the proof to petitioner's original theory; and (3) in any event the testimony does not sustain the alternative hypothesis proffered that the decedent died as a result of exertion attendant upon the discharge of the duties of his employment.

I.
Petitioner's primary hypothesis in the prior hearing and appeals, as well as in the present matter, is that the dust which arose from the component materials of the mix during the prosecution of decedent's assigned duties caused him to cough and the coughing induced a rupture of the aneurysm which, eventually, caused his death. This is essentially what the Deputy Director found after the present hearing. He said this, in the colloquy which followed the presentation of the case:
"* * * from the proof then submitted in this record now, through the testimony of Dr. Stellar and the hospital records itself and of the conclusions the Doctor drew therefrom as to the way it had been made up as I have already gone over, I will find that there was a coughing episode immediately preceding the decedent's collapse. And we have in the record evidence as to the dusty nature of the materials he handled, that was put in before, which I think would be a logical cause for this coughing episode, and of course, therewith establishment of his employment as the cause of his death."
The sole proof relied upon to link the accident to the employment, upon the basis of the alleged coughing episode, is the testimony of Dr. Stellar. He testified, not from his personal knowledge of the cause for decedent's condition, but from a memorandum which he wrote into *359 the hospital records and in which is summarized a statement allegedly made by the deceased to him. Testimony such as this is admittedly hearsay. If, however, the proffered proof satisfies the tests of trustworthiness and necessity, it may be admissible in evidence under the so-called exceptions to the hearsay rule, either as a part of the res gestae, Gilligan v. International Paper Co., supra (24 N.J. at pages 236-237) and cases there cited, or as information given a treating physician by his patient which is relevant to the physician's diagnosis or treatment, Gilligan, supra (24 N.J. at page 237); Bober v. Independent Plating Corporation, 28 N.J. 160 (1958). Such statements, to be admissible at all, must come from the mouth of the patient. State v. Gedicke, 43 N.J.L. 86 (Sup. Ct. 1881); Consolidated Traction Co. v. Lambertson, 60 N.J.L. 452 (E. & A. 1897).
The problem which confronted petitioner on the prior hearing was that it had not been established that the decedent was the source of Dr. Stellar's information incorporated by him into the reference in the hospital records to the coughing of dust. That problem remains with her on the present state of the case.
Recall, that on June 25, at about 8:00 o'clock A.M. decedent was found unconscious on the floor at his employer's plant, about 25 feet from the machine at which he had been working. He was taken immediately to All Souls Hospital at Morristown where he was attended by a Dr. Breuder. He remained unconscious and on June 26, the day following, he was transferred by ambulance to St. Joseph's Hospital at Paterson. He was admitted to St. Joseph's at about 1:00 o'clock P.M. While there decedent was under the care of Dr. Stellar, who was his treating physician. Dr. Stellar had no independent recollection of the matters which transpired during the progress of decedent's case. His testimony is based upon the written history of the case which he used and relied upon, not for the purpose of refreshing his recollection of the events, but, *360 as a memorial of what actually occurred during his superintendency of the case.
The pertinent sections of the case history, which is in the form of the hospital record, were written by Dr. Stellar and two nurses who attended decedent on June 26th. The "Personal History" sheet is entirely in Dr. Stellar's handwriting. It has two columns. One section of the first column is headed "Chief Complaint," etc. The other column on the same sheet is headed "Past History," etc. Under the "Chief Complaint" column appears the following:
"Referred by transfer from All Soul's Hosp. on subarachnoid hemorrhage.
Sudden onset 36 hours ago when coughing dust at place of work, of coma.
Bloody spinal fluid found at All Soul's.
Incontinent, comatose but thrashing about, moving all limbs, opening eyes at times since admission here."
The second and fourth sentences are the key to the case. Dr. Stellar testified that he arrived at the hospital and first saw the decedent at about 4:00 o'clock P.M. He deduces this fact from the "remarks" written by one of the nurses on another sheet of the hospital record entitled "Nurse's Record." He reasons also that the decedent gave him the "coughing dust" statement, not at about 4:00 o'clock P.M. because the patient was then "* * * barely able to respond to his name and could barely move around. But within an hour or two thereafter [when] he was able to talk coherently * * *." For this conclusion he relied, not on his contemporaneous writings or upon his recollection of the fact, but upon a note in the nurses' record which indicates that at about 6:30 o'clock P.M. the patient responded to a question asked of him by the nurse. He reasons, too, that the decedent was the person who gave him this vital information because the writing in the "Personal History" sheet does not disclose that it came from someone other than the decedent, which, he testified, would be noted there if such were the case. It is conceded, however, *361 that the sentences which surround the pertinent one were not given by the decedent and there is no source note for those statements. The writing under the "Past History" column of that same sheet discloses that the information on past history came from the widow of decedent. However, the doctor has no independent recollection of the source of that information or the time when it was given. He could not say whether it preceded or succeeded his receipt of the information reflected under "Chief Complaint." The doctor has no independent recollection of the time when decedent first regained consciousness or how soon thereafter it was that he saw decedent, nor does the hospital record disclose that he saw decedent on June 26 after about 4:00 o'clock P.M. The important cross-examination of the doctor follows:
"Q. The fact that the hospital record in the personal history does not say from whom the source of the chief complaint aspect of the history  * * *
Q. (continuing) causes you to believe that you got that history from the decedent, isn't that so?

* * * * * * * *
The Witness: I would answer that by saying that I am testifying from the hospital record because of the fact that it is four plus years and I cannot recall the details, so that I am using the hospital record and which includes your reading from it.
Q. At the present time you have no recollection of from whom you got that history? A. No, I can't recall it as a memory.
Q. I believe you testified on direct examination one of the reasons, at least, that you believe now that the history came from the decedent was that under the chief complaint portion of P-3, under personal history, there was no notation that it came from anybody else, isn't that so? A. That's right.
Q. Now, was there anything else upon P-3 which strengthens your recollection or in any way affects your recollection as to the source from which you received the history?

* * * * * * * *
The Witness: Yes, the fact that in the notes on the chart, the nurses' notes particularly, it indicates that the patient very soon thereafter was able to respond coherently.
Q. Very soon thereafter what, doctor? A. Very soon thereafter the time of my very first examination when I recorded on the examination sheet the patient's condition at the time that I first saw him, at which time he was barely able to respond to his name and *362 could barely move around. But within an hour or two thereafter he was able to talk coherently at which time he was still there and the history, although written before the physical examination, both the writing of the history and the writing of the physical examination follow the action of getting the examination done, which would be done first here, and getting the history which would be done second. In other words, seeing a patient in a coma the first thing that I do and did here was to examine the patient and then get data as I went along as the patient became more able to respond, and then later sat down and wrote it after taking care of the patient. The writing came later.

* * * * * * * *
Q. Do you recall when the writing which is in your handwriting thereon was physically written? A. Using the same criteria that I have used in answering your other questions, that is referring to the record and knowing my practice, the portion of the personal history which covers the present illness was written on the evening, sometime of the late afternoon or early evening, of June 26th, and the rest of the history, the past history, was written at whatever time I saw the patient's wife, which I don't recall now.
Q. You don't recall whether you saw the patient's wife before you had the physical examination of the patient or not, do you? A. I cannot recall that, no.
Q. It is just as likely that you saw the wife before your physical examination as it is afterwards, isn't that so? A. Well, I don't know whether she came in with the patient or afterwards or just what.
Q. There are no circumstances one way or the other which indicate to your recollection which occurred first? A. That's right, I cannot tell that."
The petitioner's proofs fail to tie the employment to the accident on the coughing incident for several reasons.
First, there is no competent proof that the statement about coughing dust, written by the doctor into the hospital records, came from the decedent. The doctor's deduction that it did is not testimony as to facts but a mere conclusion, and that conclusion is not borne out by the hospital record, which is the entire foundation for it. The location of the reference to "coughing dust" in the "Chief Complaints" column of the "Personal History" sheet almost conclusively refutes the theory that it came from the decedent. The doctor's testimony was that the writing of the entry in the hospital record came after the making of *363 the physical examination, and probably in the late afternoon or early evening of June 26th. The last entry pertaining to the physical condition of the decedent, under "Chief Complaints," indicates a condition strongly reflecting the inability of the patient to speak coherently. The closest approach to a suggestion of consciousness is the reference to "opening eyes at times." If the history as to coughing dust had, in fact, been given to the doctor by the decedent during the day it would seem certain that there would have been some reference in this section of the record to the fact that the patient had, on at least that occasion, become conscious and coherent, rather than the indication by what is written in the record that his closest approach to consciousness prior to the making of the record was that he "opened his eyes at times since his admission here." It seems more likely that the doctor received his information as to coughing dust from the petitioner herself, whose testimony was that she was at the hospital all day on June 26. Although she testified that the decedent was not conscious at any time on that day, the notations on the hospital records by the nurses indicate the contrary. The conclusion that it was petitioner who supplied the doctor with the critical information is also supported by the fact that the petitioner concededly gave the doctor, on June 26, the information with respect to "Past History" which he recorded on the same sheet.
Moreover, as indicated, the doctor has no actual recollection of having received any statement from the decedent. His conclusion is founded upon his interpretation of the record and especially upon certain portions which he did not write. Thus, neither the necessity for, nor the trustworthiness of the statement under the "treating physician" rule has been established.
Second, the failure to prove who made the alleged statement as to coughing dust, as above noted, and the circumstances surrounding its utterance preclude its admissibility under the res gestae exception to the hearsay rule.
*364 Third, even assuming that the statement originated from the decedent, there is absent any proof that it came before decedent had time for reflection, thus, it fails to satisfy the test of trustworthiness under the res gestae rule.
Further militating against petitioner's theory of the incident is the testimony offered by respondent on the remand, indicating that the batch of materials in the decedent's machine had been fully prepared and its processing finished long before he was found on the floor. No empty bags were found at the decedent's machine. Moreover, he was seen walking about the floor some distance from his machine by several co-workers just a few minutes before his body was found and a considerable period of time after the time when, according to respondent's proof, the mix and processing must have been finished. The times of observation of the decedent are supported by reference to the "punch-in" cards showing when the observers, who were decedent's co-workers, came to work. The significance of this testimony lies in Dr. Stellar's testimony that if the cough induced rupture of the aneurysm, coma would have followed the cough by "seconds or minutes."
Petitioner sought at the oral argument to refute these proofs by the theory that the decedent might have coughed dust while discarding empty bags near the place where he was found unconscious. The completely conjectural nature of this theory is indicated by the fact that it is not even mentioned in petitioner's brief and was not advanced at any prior phase of this case. It certainly cannot be said to have any foundation in factual probability on this record.
Our conclusions on this phase of the case are (1) that the petitioner failed to prove by competent evidence that a work-connected coughing incident preceded the collapse, and (2) that the petitioner has not sustained the burden of proof by a preponderance of the credible evidence that any coughing incident caused or contributed to the ruptured aneurysm which led to decedent's collapse and death.

*365 II.
We proceed to petitioner's alternative theory that the strain from the exertion in loading the mixing machine led to the terminal episode. The receipt of evidence to sustain such a theory was within the contemplation of the remand. The Supreme Court said, in connection with the remand (24 N.J. at page 238), that "the parties should have full opportunity to introduce before the Division any additional testimony which may shed further light as to whether there was a causal connection between the decedent's work and his collapse at respondent's plant on the morning of June 25, 1953."
Petitioner submits the alternative theory that the rupture of the aneurysm resulted from strain attendant upon the discharge of the ordinary duties of decedent's employment. Bialko v. H. Baker Milk Co., 38 N.J. Super. 169 (App. Div. 1955); compare Fox v. City of Plainfield, 10 N.J. Super. 464 (App. Div. 1950), where the emergent nature of the work induced a rupture, and Reynolds v. Public Service Coordinated Transport, 21 N.J. Super. 528 (App. Div. 1952), certification denied 11 N.J. 214 (1953), where the emotional stress occasioned by an automobile collision induced a rupture. Respondent argues that petitioner failed to carry the burden of proof in that connection. In Reynolds v. Public Service Coordinated Transport, supra (21 N.J. Super. at page 537), the court said:
"In analyzing the evidence in the situation presented we look for the `preponderance of probabilities.' The compensation claimant carries the burden of demonstrating that such a preponderance favors the hypothesis tendered by him. To sustain a recovery it must appear that the hypothesis proposed is `a probable or more probable hypothesis with reference to the possibility of other hypotheses.'"
We must, therefore, examine the evidence in order to ascertain whether petitioner bore the burden so cast upon him.
The procedure the deceased was obliged to perform on the *366 morning in question was accurately stated in petitioner's hypothetical question:
"That on the morning of June 25, 1953 he went to work and that part of his work was forceably ripping open eleven 100 pound bags of starch. Each bag was interlaced with string and that he either carried or dragged each of these bags to a machine from a platform and manually lifted and dumped the contents of each bag, which aggregate over one-half ton in weight, into the machine, two of which bags he had to lift a distance of at least 4 feet into the machine. That in addition to this he had to take a metal scoop which held approximately 2 pounds of material and had to dig this scoop into a metal drum of borax, walk over to a basket or pail and empty the scoop into the basket or pail until he had accumulated 35 pounds, then take the pail and empty the contents into the machine. He then had to weigh out 25 pounds of caustic flake soda which was in a drum on the platform, scoop it out with a scoop the same as he did for the borax and place approximately 2 pounds of each scoop and dump it into the pail until he obtained the required 25 pounds, then take the pail and dump the contents into the water in the top of the machine. In addition to this he had to take the empty starch bags down to a baler and bale them, then clean the platform with a broom."
Dr. Stellar testified, in answer to the above question:
"Q. Would you want the question repeated? A. No, thanks. Strain such as described of lifting 100 pound bags, and so on, could act as a precipitating factor to rupture a pre-existing aneurysm.
Q. Is that the more probable cause than natural causes without the exertion, doctor? A. I'm sorry?
Q. Is that the more probable hypothesis, that the exertion caused by the lifting of these eleven 100 pound bags and dumping them onto a platform, two of them into a four foot space, is that a more probable hypothesis than that the rupture was due to natural causes without the exertion? A. Well, I don't know that I can say one is more reasonable than the other.
Q. Well, let us say more probable. A. I think I could only say it depends on the circumstances. The rupture of an aneurysm can take place without any antecedent history of a precipitating factor, but it may take place, and often does, with a precipitating factor, which means a strain of some kind.
Q. In your opinion is it more probable that the ruptured aneurysm was a result of the exertion caused by this work which I have outlined to you rather than by natural causes, assuming that there was no evidence of coughing ? A. I would say it is more probable that an aneurysm will rupture when there is a strain associated than when there is no strain.
*367 Mr. Winer: Thank you, doctor. Cross examine.
Re-cross-examination by Mr. Monigan:
Q. Doctor, in arriving at a conclusion as to the more probable of a hypothesis that cerebral aneurysm was caused to rupture either spontaneously or as a result of exertion, I take it you are obliged to consider the degree of the exertion, are you not? A. Yes, I am.
Q. And you are obliged to consider whether or not the exertion performed is a common routine operation of the person who performs it or whether it is an unusual kind of exertion, isn't that so? A. That's right.
Q. The reason that exertion may have some effect as a precipitating cause upon this rupture of a cerebral aneurysm is because it causes an elevation in one's blood pressure, isn't that so? That's right.
Q. And so long as there is, an aneurysm will rupture either by reason of its own defect or because there is an increase in blood pressure, isn't that so? A. That's right.
Q. It is just as reasonable to believe that an aneurysm will rupture by reason of its own condition as it is to believe that an aneurysm will rupture because of an elevation of blood pressure, isn't that so? A. Not exactly. I will say that the strain which raises the pressure adds to the aneurysm and the defect which is already there.

* * * * * * * *
Q. All right, I will rephrase the question. Simply because a cerebral aneurysm ruptures, there is no more reason to project the idea that the aneurysm ruptured at that time as the result of some exertion than it is to believe that it ruptured because of its inherent defective quality, isn't that so? A. That is so.
Q. Now, in order for the decedent's work to have produced an elevation in blood pressure, there must have been a degree of exertion which would result in, or which would cause an elevation in blood pressure, isn't that so? A. That is so.
Q. And you, of course, are not able to express an opinion as to whether or not the decedent, in fact, had such exertion on the day of June 26, 1953 that his blood pressure was elevated, do you? A. No.
Q. And whether or not this operation of dumping the bags, and so forth, would have raised the decedent's blood pressure would depend upon his reaction to the operation itself, wouldn't it? A. That is true, but I think we should clarify the point about blood pressure. It is not accurate to say blood pressure. I should have mentioned it before.
Q. Cerebral pressure? A. It should be intracerebral pressure or intracranial pressure is more accurate.
Q. But your observations in respect to the effect upon blood pressure would be equally applicable to the elevation of pressure of intracranial pressure? A. That is a little different. Such as ordinary coughing, straining moving the bowels, and so on, raises the *368 intracranial pressure a considerable degree. They don't do much to the blood pressure alone but they do raise the intracranial pressure. One can see that in a measuring device.
Q. But, of course, we have no such accurate method of approach in this case since none of us were there, isn't that so? A. That is true.
Q. And nevertheless the degree of effect of the exertion upon the individual patient would depend upon his own reaction to that exertion, isn't that so? A. That is true."
Respondent offered no medical testimony. An analysis of Dr. Stellar's testimony does not support the conclusion that it is more probable that deceased died as a result of the performance of his usual work load than from natural causes. He expressly refused to state that it was more probable than not, that the strain contributed to the rupture of the aneurysm. His testimony that it is more probable that an aneurysm will rupture when there is an associated strain than where there is not, is an obvious generality, and not the equivalent of the statement of an opinion that this particular ruptured aneurysm more probably than otherwise was caused or contributed to by any strain the decedent was undergoing. Petitioner did not carry the burden under the exertion theory.
Finally, petitioner argues that the court must accept one or another of her various theories of causal relationship between the work and the incident because there is no other proof to explain the ruptured aneurysm. But this is not so. Even Dr. Stellar testified that in his experience "cerebral aneurysm * * * rupture spontaneously without any precipitating cause other than their mere existence" and that were it not for the history given him as to the coughing spell he would have no opinion as to the cause of this incident. Thus, the natural occurrence of a ruptured cerebral aneurysm is a completely plausible explanation of decedent's collapse in the absence of competent and persuasive proof of attribution of the incident to the alleged coughing dust episode.
We have conscientiously discharged our obligation under Russo v. United States Trucking Corporation, 26 N.J. 430 *369 (1958) and Ricciardi v. Marcalus Mfg. Co., 26 N.J. 445 (1958) to revaluate the proof de novo, both that taken originally and that adduced at each hearing under the remands. The proofs do not satisfy us that petitioner has established, however, that dust was in fact present at his contributory connection between any phase of decedent's work and his fatal collapse.
Reversed.
FREUND, J.A.D. (dissenting).
On the "troublesome issue" of whether the petitioner carried the burden of establishing that the decedent had actually inhaled dust which had induced coughing and which in turn had brought on the rupture of the cerebral aneurysm, I find myself in disagreement not only with the majority's views but also with those I previously entertained when the case was first before us.
In the prior unreported opinion of this court, we found no competent proof either of the presence of dust at the decedent's machine or of a coughing seizure, and hence no causal connection between his work and his death. Proceedings in the case subsequent to our determination have established her case on the basis of a probable causal or machine. And the lower tribunals have since determined that the records of the St. Joseph Hospital are a sufficiently trustworthy memorial of the fact of a coughing attack. The majority refuses to accept the latter finding.
The majority opinion states that the sole link between the accident and the employment is Dr. Stellar's testimony and that, since he could not remember the source of his information, his testimony was untrustworthy. But the trustworthiness of the doctor's testimony is not the focal point. We should be more concerned with the hospital record, which the Supreme Court held could establish the manner and place of injury if the reference to coughing therein is admissible under the "treating physician" exception to the hearsay rule. Gilligan v. International Paper *370 Co., 24 N.J. 230 at page 238 (1957). Thus the doctor's testimony is important, not in the sense that it will or will not establish the employment connection, but only in the sense that it might, in turn, establish the trustworthiness of the hospital record. See McCormick, Evidence (1954), § 290, p. 611; Annotation, 44 A.L.R.2d 553 (1955).
Yet I agree with the basic premise of the majority opinion that where there is a preliminary question of fact to be decided before evidence is to be admitted, the burden of proving the preliminary fact rests upon the proponent of the subject evidence. 1 Wigmore, Evidence (3d ed. 1940), § 18(E), p. 347; Annotation, 53 A.L.R.2d 1245, 1260 (1957). Nor is it seriously to be doubted that, where the particular evidence is not only admitted but constitutes the very basis of the ultimate result reached, the lower tribunal's findings of fact on the preliminary issue are reviewable. Compare State v. Monich, 74 N.J.L. 522, 526 (E. & A. 1906); W.A. Manda, Inc. v. City of Orange, 82 N.J.L. 686, 688 (E. & A. 1912). Since the issue here is the hearsay nature of the hospital record which, in turn, depends upon the preliminary fact question of whether the information contained therein came from the decedent, I am satisfied, as is the majority, that we must proceed upon the basis that the burden of proof was the petitioner's to establish the source of the vital history in the "Chief Complaint" column of the hospital record. Nevertheless, in my judgment, the evidence preponderates in favor of the conclusion that the doctor received the pertinent communication recorded in that column directly from the decedent when the latter experienced a lucid interval during the evening of June 26.
The majority finds it more probable than not that the doctor's source of information was the petitioner herself. They reason, first, that the location of the reference to the coughing dust incident in the "Chief Complaint" column raises a grave doubt that it came from the decedent  and this because the information immediately preceding and *371 following the reference could not have been furnished by the decedent. But the location of the reference is inconsequential, for while the decedent could not have told Dr. Stellar of his "subarachnoid hemorrhage" and "Bloody spinal fluid," it is just as improbable that these comments came from the wife.
The majority finds support for its conclusion in the fact that the wife concededly gave the doctor the information under the "Past History" column on the same sheet. But the doctor specifically designated that this history was "from wife"; no such reference to her as the source appears in the "Chief Complaint" column. Moreover, Dr. Stellar testified that he believed the information under the respective columns had been written at different times. Fortifying his belief is the fact that the entry under "Chief Complaint" is in noticeably heavier ink than that under "Past History."
Nor is it persuasive that the doctor had no recollection of having received any statement from the decedent. He had no recollection of having received the coughing dust statement from the wife either. His failure to recollect is understandable since the information was imparted to him over four years prior to his testifying.
The majority seems to find crucially significant the fact there is no indication in the "Chief Complaint" column of the patient's ability to speak coherently. It is said that if the patient had been able to make the "coughing dust" statement, there would have been a notation indicating his consciousness. I cannot agree. The column is titled "Chief Complaint: Date and mode of onset, probable cause, course." The information called for is that pertaining to disability, to complaints, not to that dealing with any improvement in his condition, such as a brief return to consciousness.
Moreover, if the majority is suggesting that there was no return to consciousness at all on June 26 when this record was made by Dr. Stellar, they will have ignored the unquestionably trustworthy "Nurse's Record," which contains *372 the following entry in the space opposite 6:30 and 7:00 P.M., on June 26:
 "Pt. aroused 
 When asked how
 he felt he answered
 `fine  I just
 have to get better.'"
At 10:00 P.M. that same night, the same nurse recorded:
 "Pt moving about
 well 
 Conscious:
 Talking coherently 
 Alert."
That the decedent did enjoy a return to consciousness on the evening of June 26 not only appears conclusively to be the fact but also was accepted as such by us on the prior appeal and by the Supreme Court in its opinion. See 24 N.J. at p. 236. Indeed, the reason why it has been determined that the wife cannot testify that the decedent told her on June 27 that dust had come from his machine, as under the exception to the hearsay rule for res gestae, is, in part, that he had the opportunity for deliberation during his conscious interval on June 26. I therefore cannot agree with the majority's conclusion that there is great significance in the doctor's failure to indicate a return to consciousness on June 26.
In my judgment, it is more probable than not that the "coughing dust" statement came from the decedent himself and that it, as a result, is a trustworthy and competent declaration of a past symptom under the "treating physician" exception to the hearsay rule. This conviction is shared by Judge Mintz who, in his opinion in the County Court affirming the award made by the Deputy Director, wrote:
"Concededly, the effectiveness of Dr. Stellar's testimony is somewhat impaired by his frank admissions on cross examination. It must, however, be remembered that the Doctor was testifying to an *373 incident which transpired more than four years ago. The Deputy Director had the opportunity to evaluate his testimony on two occasions. He regarded the Doctor's testimony as credible. The County Court should give `due, although not necessarily controlling, regard to the opportunity of the agency to judge of the credibility of witnesses.' Donofrio v. Haag Brothers, Inc., 10 N.J. Super. 258 (App. Div. 1950).
Significantly, the All Soul's Hospital record covering the period from decedent's admission on June 25 to his transfer to St. Joseph's Hospital on June 26 contains no reference to the presence of dust nor to a coughing incident. The decedent was admitted to that hospital in a comatose condition. The history was furnished by the decedent's wife and two brothers and merely recites an unexplained collapse at his place of employment. The petitioner visited the decedent at All Soul's Hospital but testified that he was unconscious. She further stated that he was first able to respond to her when she visited him at St. Joseph's Hospital on the 27th. At that time the decedent told her about the presence of dust in the plant. This statement was properly excluded as hearsay, but even this hearsay statement does not refer to a coughing incident. The testimony sustains the inference that Mrs. Gilligan was unaware of any history or complaint of dust in the respondent's plant until June 27. There is nothing in the testimony from which it may be inferred that on or before June 26 petitioner had ever heard from any source about a coughing dust incident. The circumstantial bits of evidence tend to eliminate decedent's wife, Dr. Breuder, the treating physician at All Soul's Hospital, and the personnel of that hospital as the source of the vital history. The meager supplemental testimony of Dr. Stellar, together with the circumstantial evidence, now justifies a finding (contrary to the initial determination of this Court), that Dr. Stellar received the history of `coughing dust at place of work' from the decedent during his lucid interval on the evening of June 26."
Further conducive to the finding that the decedent was the source of the statement is the fact that the "coughing dust" reference itself states that the sudden onset occurred "36 hours ago." Thirty-six hours prior to the evening of June 26 would be the morning of June 25 when the decedent suffered the attack.
To reverse this judgment, the court must find not only that the petitioner's testimony was falsified but also that she designedly misinformed Dr. Stellar of a coughing incident at the very moment when her husband lay unconscious with his life in Dr. Stellar's hands. Such hypothesized conduct *374 on her part is contrary to human experience. Moreover, I find undeserved the implication in the majority opinion that the wife perjured herself in testifying that the decedent was not at any time conscious on June 26. The petitioner did not so testify. She said only that she had been permitted to stay with her unconscious husband for "most of the day on the twenty-sixth," and that she "didn't stay all night." I read her testimony as clearly implying that she was not present at the hospital on the evening of June 26.
Conceding that the source of the "coughing dust" statement cannot be detected with absolute certainty, I find the circumstantial evidence, taken with the petitioner's disavowal of having mentioned the incident to the doctor, to be sufficient to support the hypothesis that the decedent made the statement.
Recalling that the decedent was 28 years of age and in good physical condition, that he had worked for the respondent for three years, that he reported for work on June 25 in apparent good health, and that there was such a presence of dust in the atmosphere as could have caused a coughing spell, I am now satisfied that it has been proved by a preponderance of the evidence that the cause of death was work-connected.
I would affirm the judgment under review.