62 N.J. Super. 420 (1960)
163 A.2d 173
HARRY GREENFARB, BY HIS WIDOW, SARAH GREENFARB, PETITIONER-APPELLANT,
v.
ASSUNTA ARRE T/A ITALIAN TASTY CRUST BAKERY, RESPONDENT-RESPONDENT.
SARAH GREENFARB, PETITIONER-APPELLANT,
v.
ASSUNTA ARRE T/A ITALIAN TASTY CRUST BAKERY AND FIDELITY CASUALTY COMPANY OF NEW YORK, RESPONDENTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued March 14, 1960.
Decided July 5, 1960.
*422 Before Judges GOLDMANN, CONFORD and HANEMAN.
Mr. Seymour B. Jacobs argued the cause for appellant (Messrs. Balk & Jacobs, attorneys; Mr. Jacobs, on the brief).
Mr. Isidor Kalisch argued the cause for respondent.
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Petitioner appeals from a County Court judgment dismissing her dependency claim petition as well as the claim petitions filed by her husband in his lifetime.
Harry Greenfarb, a baker in respondent's employ, filed two compensation claim petitions on July 20, 1951. The first alleged that he was injured on April 15, 1951 when he tripped over a handtruck while carrying a carton of jelly tins and fell; the second, that he was injured on April 14, 1951 while lifting a 300-pound piece of dough. Both petitions specified "Injuries to body, internal injury, heart, left inguinal hernia, abdomen and nervous system." The two accidents allegedly occurred on the same night workshift.
Greenfarb died January 4, 1952. On April 4, 1953 his widow filed a dependency claim petition in conjunction with the two just mentioned. For unexplained reasons the petitions were not heard until January 1959, when all three were consolidated and heard by the deputy director.
Petitioner testified that when her husband left for work the evening of April 14, 1951 he "was fine" and "looked wonderful." She was alarmed when he returned home in a taxicab at about 5:45 A.M. the next morning, a Sunday, *423 looking ill. He did not eat breakfast, as was his usual habit, but went straight to bed. Petitioner called Dr. Henry L. Kuperman, who arrived about 10 A.M. After examining defendant he ordered him taken to a hospital by ambulance. Greenfarb was hospitalized until May 10, 1951, when he returned home. He never went back to work.
Decedent's married daughter, Ann Isaacs, who lived with her parents, testified that when her father came home from work the morning of April 15, "he was very ill; he was in pain; he had difficulty in breathing" and "he would bend over to help himself in breathing, to catch his breath." Thereafter "he wasn't the same * * *. He couldn't do a thing. He just didn't live the life he lived before." She also testified, without objection, that she had phoned respondent Mrs. Arre on Sunday afternoon and told her that decedent was quite ill, was being taken to the hospital, and would not be to work that night; "that he had come home ill; he was hurt on the job."
Irving Isaacs, Ann's husband, said that he, too, had spoken to Mrs. Arre when he went to the bakery the next morning, Monday, to pick up decedent's clothes. He told her and a man who was with her that decedent had suffered a heart attack while lifting a heavy object.
Dr. Kuperman, a general practitioner, testified that Greenfarb had been his patient since September 1948, when he treated him for a bronchial asthma condition. On July 21, 1949 he admitted decedent to a hospital for chest pains. Electrocardiograms and the subsequent clinical history revealed an acute coronary thrombosis, anteriolateral in nature, and more accurately described on cross-examination as an acute myocardial infarction due to arteriosclerotic coronary thrombosis. Decedent remained in the hospital until August 8 and returned to work October 22, 1949. On November 26, 1949 he saw Dr. Kuperman for bursitis of the left shoulder, which was treated for more than a month. On April 3, 1950 decedent visited him complaining of obstipation, and on October 10, 1950 for an upper respiratory infection. *424 There were also two general checkups on March 11 and June 26, 1950. On none of the visits following decedent's return to work did the doctor observe any complaints referable to the heart, or any condition indicating that work was interdicted.
The doctor then testified as follows, reading from the hospital record and history he had obtained from decedent:
"On the night before admission at about 10:30 P.M. he lifted a large piece of dough weighing about 300 pounds with the help of another baker at the Patsy Arre Bakery, 128 8th Avenue. Immediately after this, he felt pain from the left inguinal region up to the left anterior chest and down the left arm. This pain was severe and persistent, but the patient continued to work. Several hours after the onset, he developed pain in his upper back across the shoulders and felt very weak. He finished his work at about 6:00 A.M. and returned home. Shortly after arriving home, he went to bed, but could not sleep because of pain in left anterior chest. He went to the bathroom and on attempting to have a bowel movement, became very weak and dizzy and almost fainted. He had to be assisted back to bed and pain became worse. Call for a physician was then made. Electrocardiogram was taken and hospitalization was advised. He was given a hypodermic injection of demerol for the relief of pain."
The electrocardiogram indicated an acute coronary thrombosis, later diagnosed as an acute myocardial infarction due to arteriosclerotic coronary thrombosis, the infarction being posterolateral. On December 29, 1951 Dr. Kuperman advised his patient to seek only a sedentary type of occupation. Greenfarb expired suddenly while at home in bed on January 4, 1952, due to an acute myocardial infarction.
In response to a hypothetical question embodying the facts contained in the history he had obtained from decedent, Dr. Kuperman testified that in his opinion a causal relation existed between the lifting of the 300 pounds of dough, on the one hand, and the coronary thrombosis and, ultimately, the death, on the other.
In the course of Dr. Kuperman's testimony respondent vigorously objected to any testimony or reference in the hospital history as to how the alleged accident happened. *425 Counsel for petitioner argued that such proof was admissible under Bober v. Independent Plating Corp., 28 N.J. 160 (1958). The deputy director reserved decision until the close of the case.
Dr. Saul Lieb, an internist, testifying in response to a hypothetical question like the one addressed to Dr. Kuperman, said that in his opinion there was a causal relationship between decedent's lifting of the large piece of dough and his consequent heart disability and ultimate death. Although the 1949 and 1951 infarctions involved different areas, one on the front and the other on the back of the heart, the matter was academic because the heart had been weakened by the first attack and made more susceptible to the effects of any effort.
At the close of petitioner's case respondent moved to dismiss the petitions because an accident had not been proved, the testimony of the doctor and the history in the hospital record being inadmissible to show an accident, citing Andricsak v. National Fireproofing Corp., 3 N.J. 466 (1950). Petitioner relied upon the Bober decision. The deputy director, recognizing that the history was the crux of the matter, again reserved decision and denied the motion.
Respondent then called her expert witness, Dr. Leff, but after a short recess withdrew the offer to put him on the stand and rested upon the theory that the history given Dr. Kuperman and the hospital record, insofar as they referred to the accident, were inadmissible. Her motion for dismissal of the petitions was once more denied.
The deputy director, relying on the Bober case, held that the history given the attending physician and also the history contained in the hospital record were admissible. Accordingly, he entered judgments awarding temporary disability as well as dependency benefits. (Compensation was erroneously computed on the basis of a $30 rate rather than $25, the maximum fixed by the statute in existence in 1951, R.S. 34:15-13. Petitioner agrees that the compensation should have been calculated on the basis of the latter figure.)
*426 On appeal, the County Court judge correctly noted that apart from Dr. Kuperman's testimony "regarding the statement relating to cause made by the decedent which was incorporated in the hospital history sheet," there was no other evidence in the record which, "by a preponderance of the probabilities, establishes that a compensable injury occurred on the evening of April 14, 1951, or morning of April 15, 1951." He concluded that the histories were not admissible, and reversed.
The county judge noted that the general rule in New Jersey prior to the Bober case was that histories were admissible insofar as they were "necessary for the proper diagnosis and treatment of the injury complained of, such as symptoms, feelings and conditions," but "those portions of the history dealing with the alleged cause of injury or the place of its occurrence" were not admissible, citing State v. Gruich, 96 N.J.L. 202 (E. & A. 1921); Helminsky v. Ford Motor Co., 111 N.J.L. 369 (E. & A. 1933); Andricsak v. National Fireproofing Corp., above, 3 N.J. 466 (1950); and Gilligan v. International Paper Co., 24 N.J. 230 (1957). He held that the Bober case was clearly distinguishable because it was concerned with a doctor's history of an allergy patient: "Probing into the environmental and other factors in one's life may be extremely essential toward a proper diagnosis and treatment for an allergy patient and yet not be as to a heart patient." Following this guarded observation he said:
"* * * Furthermore, a patient suffering from a condition such as allergy, who may be subjected to a deep probing into his history for diagnosis and treatment, is more likely to be conducive to truth-telling than one complaining of a heart condition, whose recital of history to a doctor lacks the same compelling motivation for veracity and whose statements as to the cause of the symptoms or condition may well be the product of ulterior considerations."
With this latter we cannot agree. It illogically assumes that decedent, almost 60 years old, who had within the preceding two years suffered from a sequence of different physical infirmities, including one heart attack, and who *427 was in the extremely weakened condition testified to by his wife and doctor and described in the history, chose to fabricate a story as to the onset of his seizure with a view to collecting compensation benefits, rather than to relate to his physician a true account of what actually happened in order to obtain the most beneficial medical treatment. One cannot believe that a person in as serious a physical condition as decedent was at the time, would have risked jeopardizing his recovery simply in order to establish that his work contributed to his attack.
Furthermore, as to the county judge's conclusion that probing into environmental factors would be less essential in the case of a heart patient than one suffering from an allergy, it is reasonable to conclude that Dr. Kuperman would have had to know something of the nature of decedent's activity when the seizure came upon him, in order to diagnose just what the attack was. Here one must recall that he had previously treated Greenfarb for a bronchial asthma condition, bursitis of the left shoulder, obstipation, and an upper respiratory infection.
The "general rule" referred to in the County Court opinion was first completely enunciated in this State by the Court of Errors and Appeals in State v. Gruich, above. In that case defendant was convicted of procuring a miscarriage of Mrs. M. A physician was permitted to testify that several days after he had been called to attend the victim, had made up his mind that her condition was due to an abortion, and had rendered the medical service thought necessary, Mrs. M told him that an abortion had been performed on her and that "she went to a woman." The court observed that the statement made by Mrs. M was not for the purpose of treatment, for treatment had already been had and none further was proposed, her death being expected hourly. The court said:
"The rule has been settled by the Court of Errors and Appeals in Consolidated Traction Co. v. Lambertson, 60 N.J.L. 452, following the opinion of the Supreme Court in State v. Gedicke, 43 *428 Id. 86. The court there said: `It is well settled that the declaration of a patient as to his symptoms, made to his physician or surgeon for the purpose of treatment, are admissible in evidence. While such declarations partake of the nature of hearsay, they derive some credibility beyond that of hearsay, from the fact that the patient expects his physician or surgeon to be guided by them in administering remedies, and so the patient has an incentive beyond the ordinary obligation to tell the truth. But when such declarations are made not for the purpose of treatment, but for the purpose of leading the physician or surgeon to form an opinion to which he may testify as a witness for the declarant, not only is this reason for credibility absent but instead self interest becomes a motive for distortion, exaggeration and falsehood. Hence it is the better conclusion that declarations made under such circumstances are not competent evidence on behalf of the declarant.' * * *" (96 N.J.L., at pages 203-204)
The rule was repeated in the two oft-cited workmen's compensation cases, Helminsky v. Ford Motor Co., 111 N.J.L. 369 (E. & A. 1933), and Andricsak v. National Fireproofing Corp., 3 N.J. 466 (1950). In Helminsky there was evidence that when decedent returned from work on the night of April 26, 1929 his right testicle was swollen and he was running a temperature. He sent for a physician, who found the condition mentioned. Decedent subsequently worked from time to time, although he was not well. He was hospitalized when it was determined he had tuberculosis of the chest. Death occurred November 3, 1929, the autopsy disclosing that he died of tuberculosis of the testicle. For proof of an accident the petitioning widow relied mainly on the testimony of the attending physician that decedent had told him "he fell against the wheel in the Ford plant while he was working there." The Court of Errors and Appeals held this testimony clearly inadmissible, referring to State v. Gruich, above, and the English case of Gilbey v. Great Western Railway Co., 3 Butterworth W.C.C. 135 (Ct. App. 1910). It noted that the Supreme Court had found as a fact that even assuming the admissibility of the doctor's testimony (which it regarded as illegal, at least insofar as it indicated an accident occurring in the course of the employment), the testimony *429 of fellow workmen to the effect that no accident occurred, combined with the fact that the death was due to tuberculosis, demonstrated that the award was clearly against the weight of the evidence.
In Andricsak a fellow employee testified that on March 11, 1947 decedent showed him one of his testicles which was enlarged to about the size of a grapefruit and was black and blue, and told him that "he hit the bar there," the reference being to a long clinker bar which decedent used in tending the fires. Another employee testified that decedent was limping that day and showed him the condition of his testicle. On the same day decedent requested and received permission from his superior to obtain medical treatment. The treating physician testified that decedent told him he "was hit on the scrotum by an iron bar * * * at the plant." Decedent was admitted to a hospital, operated upon the following day for a hydrocele, and died two days later. The Supreme Court held that a compensation award could not be sustained upon these proofs. Since the evidence clearly showed that the alleged injury was received several days prior to March 11, decedent's statements were not admissible under the res gestae exception. And his statement to the physician was inadmissible under the general rule enunciated in Helminsky.
A marked step forward in our law took place when Bober v. Independent Plating Corp., above, 28 N.J. 160 (1958), was decided. Petitioner had been awarded compensation under the occupational disease statute, N.J.S.A. 34:15-31, for allergic bronchial asthma activated in course of employment by exposure to chrome dust which acted as an irritant to his latent disposition to allergy. The Appellate Division reversed the award, holding it was improper for the treating physician to base his opinion that the chrome dust was the activating factor in part upon some of the history given him by petitioner. The Supreme Court reinstated the award. After referring to the holdings in the Gruich and Helminsky cases, above, it addressed itself *430 to the employer's argument that petitioner's statements in the history he gave his doctor as to the chrome dust environment in which he worked and his physical reactions to it did not constitute a revelation of factors necessary for diagnosis and treatment, but rather were declarations relating to the cause of those factors. The court said:
"* * * It is true that in a sense the statements relate to cause, but in this type of situation they cannot be denied either admissibility or probative force for that reason. As can be seen readily upon analysis, they stand arrayed in the same cloak of reliability as those expressions which are thought of ordinarily as symptoms.
* * * if a latent allergic condition is activated by specific allergens or irritants, it is undisputed that part of the treatment consists of removal of the sufferer from the offending environment. Consequently, on being consulted, the doctor must seek out the particular allergen or allergens or irritants which are responsible for the condition, and the place of exposure, if a particular location can be isolated. The record indicates that in some instances when an allergen to which the patient is hypersensitive is in season in an area, the treatment consists in part of a vacation in or removal to another part of the state or country. And so, much more consideration must be given to history than in the diagnosis and care of other kinds of ailments or injuries." (28 N.J., at pages 170-171.)
"It is evident that the answers and information given by the patient during the doctor's probing for possible causes of the condition have the same driving and spontaneous motivation for truthfulness as in the usual case to be found in the reports where the hearsay exception has been recognized. In our judgment, therefore, the history thus gleaned which described the inception, the general character of the cause or external source of the condition to be treated, so far as it is pertinent to the purpose of diagnosis and treatment, is within the rule and admissible as substantive evidence. Cf. McCormick on Evidence, 564 (1954); Stewart v. Baltimore & O.R. Co., 137 F.2d 527, 530 (2 Cir. 1943); Baker v. Industrial Commission, 44 Ohio App. 539, 186 N.E. 10 (Ct. App. 1933); Dabbert v. Travelers' Ins. Co., 13 Ohio Dec. (Reprint) 792 (1870); Ferne v. Chadderton, 375 Pa. 302, 100 A.2d 854 (1953); Hammond v. Industrial Commission, 84 Utah 67, 34 P.2d 687 (1934). Accordingly, there was no error in receiving in evidence the portions of the history of which complaint is now made." (28 N.J., at page 172)
Bober unquestionably represents a more flexible approach to the general rule laid down in prior decisions  a rule *431 which, if blindly followed, would in many cases defeat the demands of justice.
The very problem before us was involved in the recent case of Gilligan v. International Paper Co., above. A proper understanding of just what that case held requires a somewhat extended discussion.
Decedent Gilligan operated a starch adhesives machine at respondent's plant. His duties included loading the machine with cornstarch, borax and flake caustics. About an hour after starting work one day he was found unconscious about 25 feet from the machine. He was hospitalized for a while, returned home, and soon after died from a ruptured mycotic cerebral aneurysm.
Except for a statement decedent had made to his wife, and which was not admissible in evidence under any of the recognized exceptions to the hearsay rule, the only evidence linking his collapse to the employment was the testimony of his treating physician, Dr. Stellar. The doctor testified that he had received a history from decedent and that according to that history, which he recorded on a hospital chart, "the patient had a sudden coughing spell while at work which was reported to be the result of inhaling dust at his place of work." With regard to whether the petitioner-widow had satisfactorily carried the burden of establishing that her husband had actually inhaled dust which had induced coughing and which, in turn, had brought on the rupture of the aneurysm, the Supreme Court observed that proof of the work-connected injury may be circumstantial rather than direct, the test being probability rather than certainty, and "where the collapse is unwitnessed and the employee's lips are sealed by death, courts throughout the country show understandable readiness to accept meagre showings of compensability," citing Macko v. Herbert Hinchman & Son, 24 N.J. Super. 304, 307 (App. Div. 1953), and 1 Larson, Law of Workmen's Compensation, 96, 102 (1952).
*432 The court went on to say that "Statements made by [decedent] at any time to his treating physician as to his present and past symptoms and feelings may well be admissible under [a] recognized exception to the hearsay rule," citing State v. Gedicke, 43 N.J.L. 86, 88 (Sup. Ct. 1881); State v. Gruich, above, 96 N.J.L., at page 204; Meaney v. United States, 112 F.2d 538, 130 A.L.R. 973 (2 Cir. 1940); Ferne v. Chadderton, 375 Pa. 302, 100 A.2d 854 (Sup. Ct. 1953); and 6 Wigmore on Evidence (3d ed. 1940), §§ 1720, 1722, pp. 70, 74. The Gruich case had quoted approvingly from Roosa v. Boston Loan Co., 132 Mass. 439 (Sup. Jud. Ct. 1882), a leading case holding that a treating physician could testify as to his patient's statements with respect to "his condition, symptoms, sensations and feelings, both past and present." Judge Learned Hand, referring to Roosa in the Meaney case, had said that "A patient has an equal motive to speak the truth; what he has felt in the past is as apt to be important in his treatment as what he feels at the moment."
Justice Jacobs, who wrote for the court in Gilligan, remarked:
"If the decedent told Dr. Stellar that his collapse occurred after `a sudden coughing spell while at work' the statement could be received by the deputy director as a declaration of a past symptom or sensation. It was relevant to the physician's diagnosis and treatment and the circumstances would abundantly import trustworthiness. While it is true that under the present state of our case law the statement could not legally establish the manner and place of injury (Andricsak v. National Fireproofing Corp., supra), it could legally establish that there had been a coughing incident immediately prior to the collapse; the rest may be a matter of fair inference from the coupling of the coughing incident with the presence of dust and the other pertinent circumstances which have been duly established. Cf. Bohan v. Lord & Keenan, Inc., 98 N.H. 144, 95 A.2d 786 (1953)." (24 N.J., at pages 237-238)
Since there was some doubt as to the source of Dr. Stellar's information and the circumstances under which it was received, the matter was remanded to the Workmen's Compensation Division for the taking of further testimony.
*433 On the remand, the Division found that Dr. Stellar had received the history in question from decedent. So did the County Court on appeal. When the matter came before this court sub nom., Kasiski v. International Paper Co., 58 N.J. Super. 353 (1959), a majority of the court concluded there was no competent proof that the statement about coughing dust, written by the doctor into the hospital records, came from decedent; more likely, he had received his information from petitioner herself. Thus, "neither the necessity for, nor the trustworthiness of the statement under the `treating physician' rule," had been established. Judge Freund, dissenting, found the evidence preponderated in favor of the conclusion that the coughing dust statement came from decedent himself and, as a result, was a trustworthy and competent declaration of a past symptom under the "treating physician" exception to the hearsay rule. In the course of his dissent Judge Freund particularly emphasized that this court "should be more concerned with the hospital record, which the Supreme Court held could establish the manner and place of injury if the reference to coughing therein is admissible under the `treating physician' exception to the hearsay rule."
The Supreme Court, in a per curiam opinion, reversed the judgment of the Appellate Division and reinstated the award in favor of petitioner for the reasons expressed in Judge Freund's dissenting opinion. Kasiski v. International Paper Co., 31 N.J. 267 (1959).
Thus, viewing in perspective the Gilligan case as it unfolded in its three-time progress through our courts, we consider it as definitely pointing in a direction away from any inflexible application of the treating physician rule expressed in the Gruich, Helminsky and Andricsak cases, despite the parenthetical reference to Andricsak in the above-quoted language from Justice Jacobs' opinion in 24 N.J. 230. Cases like the present one must be viewed in a practical light and realistically, lest justice suffer. The employee is *434 dead. There is no one to testify as to just what happened when decedent suffered his seizure  the pain proceeding from the left inguinal region up to the left anterior chest and down the left arm, pain severe and persistent, followed by developing pain across the upper back. Every attempt to discover the whereabouts of his co-worker has proved unsuccessful.
The touchstone in cases like this is the trustworthiness of what the patient told his physician, and here one must consider the whole range of circumstances: how soon after the alleged accident the statement was made, the condition of the employee at the time he spoke to his physician, and whether the physician pursued his inquiry in order to arrive at a diagnosis and a course of proper treatment.
Decedent had to come home from work in a taxicab because of his pain. His suffering had worsened through the night hours and early morning of Sunday. He was in a weak condition, fighting for breath. A physician was called, and we can readily understand why, on a Sunday morning, he did not arrive until 10 A.M. Dr. Kuperman had before him a man past his middle years whom he had treated for bronchial asthma, heart, bursitis, obstipation, and an upper respiratory infection. The most natural thing in the world was for him to ask not only how the patient felt but what had happened, in order that he might fix as quickly as possible upon the exact nature of Greenfarb's condition. What Greenfarb told him about his condition and symptoms some hours past was not only admissible under the Gilligan case but, as was the situation there, it was a matter of fair inference to couple that condition and those symptoms with the work Greenfarb was doing as a baker.
At least one modern authority has spoken out in favor of admitting the testimony of a treating physician as to his patient's statement of the history of the injury. McCormick, in his work on Evidence, § 266, p. 564 (1954), states:
"It would seem, moreover, that the same practical guaranty of trustworthiness would attach to those parts of the `history' given *435 by the patient to the doctor for treatment which describe the general character of the cause or external source of the condition to be treated, so far as this description is pertinent to the purpose of treatment. The professional standards for the regulation of hospitals require the gathering of this information from the patient and the person treated will be fully conscious that his treatment may well be affected by his report as to the cause, whether a fall, a crushing by a heavy object, or a collision. Other features of the incident, such as the place where it occurred or who was at fault, seem unrelated to treatment. Some courts have accepted the view that these statements as to external cause when relevant to treatment and made to a doctor employed for that purpose are admitted as evidence of the fact stated. This conclusion, particularly in actions for death where there were no eye-witnesses other than the victim, seems the view most consonant with the demands of justice. * * *"
The author readily admits that the greater number of courts have thus far declined to permit such declarations as to cause, even when made to a doctor for treatment, to be used as substantive evidence.
In accord with the view that Dr. Kuperman's testimony and the hospital record should be admissible not only as a declaration of past symptoms but as a history reasonably necessary to treatment and diagnosis: Stewart v. Baltimore & Ohio Ry. Co., 137 F.2d 527 (2 Cir. 1943); Lathem v. Hartford Accident & Indemnity Co., 60 Ga. App. 523, 3 S.E.2d 916 (Ct. App. 1939); Hillman v. Utah Power & Light Co., 56 Idaho 67, 51 P.2d 703 (Sup. Ct. 1935); Shell Oil Co. v. Industrial Comm'n, 2 Ill.2d 590, 119 N.E.2d 224 (Sup. Ct. 1954); Baker v. Industrial Comm'n of Ohio, 44 Ohio App. 539, 186 N.E. 10 (Ct. App. 1933); Ferne v. Chadderton, 375 Pa. 302, 100 A.2d 854 (Sup. Ct. 1953); Hammond v. Industrial Comm'n, 84 Utah 67, 34 P.2d 687 (Sup. Ct. 1934); and see Bohan v. Lord & Keenan, Inc., 98 N.H. 144, 95 A.2d 786 (Sup. Ct. 1953); Waldroop v. Driver-Miller Plumbing & Heating Corp., 61 N.M. 412, 301 P.2d 521 (Sup. Ct. 1956); Malila v. Meacham, 187 Ore. 330, 211 P.2d 747 (Sup. Ct. 1949); Kraut v. State, 228 Wis. 386, 280 N.W. 327 (Sup. Ct. 1938).
*436 These cases uniformly hold that where the testifying physician was called in his ordinary professional capacity by the injured person for the purposes of securing relief from pain and for medical treatment, and there are no circumstances casting suspicion on the genuineness of the utterances, all statements by the patient relating to symptoms and sufferings, whether past or present, and though involving a history revealing the nature of the accident, may be testified to by the physician and become substantive evidence in the case if they had a reasonable bearing upon his diagnosis and treatment of the patient. And see 3 Jones, Commentaries on Evidence (2d ed. 1926), § 1217, p. 2234. For the patient to state untruly to his doctor the cause of his physical debility would be directly against his most vital interest in saving his health and life. The cause of the illness would be an important element in forming the treating physician's opinion.
We note, as did Justice Jacobs in Gilligan, above, 24 N.J., at page 236, that Rule 63(4) of the Proposed Uniform Rules of Evidence (1953) would broadly permit the admission of any decedent's statement under proper safeguards:
"Hearsay Evidence Excluded  Exceptions. Evidence of a statement which is made other than by a witness while testifying at the hearing offered to prove the truth of the matter stated is hearsay evidence and inadmissible except:

* * * * * * * *
(4) Contemporaneous Statements and Statements Admissible on Ground of Necessity Generally. * * * (c) if the declarant is unavailable as a witness, a statement narrating, describing or explaining an event or condition which the judge finds was made by the declarant at a time when the matter had been recently perceived by him and while his recollection was clear, and was made in good faith prior to the commencement of the action;

* * * * * * * *"
And see, Report of the Supreme Court Committee on the Revision of the Law of Evidence, Proposed Rule 63(4) (1955), and Drafters' Comment and Committee Annotation *437 to clause (c); McCormick, "Hearsay," 10 Rutgers L. Rev. 620, 624 (1956).
6 Wigmore on Evidence (3d ed. 1940), § 1722, pp. 74-5, takes the view that statements as to external circumstances causing the injury are ordinarily not admissible in that they "do not satisfy the Necessity principle, because they do not relate to an internal state, and thus other evidence is presumably available; moreover they have not the usual condition of Trustworthiness because they are not naturally called forth by the present pain or suffering * * *." He notes that attention had been focused on this class of statements in demanding a relaxation of strict rules before state industrial commissions. As applied to the present case, the Wigmore argument is vulnerable: (1) the ground of necessity exists, there is no other proof of the work connection; and (2) the fact that decedent was seeking relief and treatment is a guarantee of the trustworthiness of his statement.
In line with what we consider the more liberal approach first projected in the Bober case and carried forward in Gilligan, and adopting the view expressed in McCormick and the out-of-state cases we have cited as more consonant with the demands of justice, we hold that under the circumstances here present the history given by decedent to Dr. Kuperman and recorded by him in the hospital record was properly admitted. We need go no further than to approve the rule in a case like this, where the injured person is dead and there is no other evidence to supply the information available in the statement made to his treating physician. We leave for another time and case the problem whether the rule we adopt today should be applied where the declarant is living and there is evidence corroborative of how the accident happened.
Respondent in her answering brief for the first time raises the question of credibility to be accorded to the testimony adduced by petitioner. This was never in issue; the deputy director and the County Court judge not once *438 suggested that credibility was involved. The only question was the admissibility of the history given the treating physician and recorded in the hospital record. The competence of the testimony, and not its believability, was what was argued in the Division and before the County Court judge. We have, however, reviewed the record and find no reason for withholding credibility from the proofs adduced by petitioner.
Respondent also seeks to draw various inferences from the fact that the case was not brought on for hearing until 1959. Whatever the reason, the delay has nothing to do with the determinative fact question  the history Greenfarb gave his doctor.
Respondent also contends that the reading of the hospital chart into the record by Dr. Kuperman, after he said he recalled the event, was improper, citing Springer v. Labow, 108 N.J.L. 68, 71 (Sup. Ct. 1931). But the rule of that case is inapplicable. The doctor first stated that he required the use of the history to refresh his memory, quite clearly indicating thereby that he did not recall everything that took place or everything decedent had told him. It is the following question and answer that respondent refers to:
"Mr. Weber: Do you have a recollection of this event at all without that record?
The Witness: Oh, yes, sure." (emphasis supplied)
All that can be gleaned from this is that the doctor meant he had some recollection of the event. It therefore was not improper for him to consult the record; further, since it could have been admitted in evidence, N.J.S. 2A:82-35, we cannot see how harm was done by permitting the doctor to read the record aloud.
The County Court judgment is reversed and the award reinstated at the corrected figure to which petitioner has agreed.